# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 15, 2015

Lyle W. Cayce
Clerk

No. 14-30444

————

WALTER POWERS, JR., individually, and in his capacity of President of the Fraternal Order of Police, Crescent City Lodge #2, and its Members; FREDERICK C. MORTON,

      Plaintiffs - Appellants

v.

UNITED STATES OF AMERICA; POLICE ASSOCIATION OF NEW ORLEANS; MICHAEL GLASSER, individually and as President of the Police Association of New Orleans, Inc.,

      Intervenors - Appellees

CITY OF NEW ORLEANS,

      Defendant - Cross-Defendant - Appellee

MITCHELL J. LANDRIEU, in his official capacity as the mayor/chief executive of the City of New Orleans; RONAL W. SERPAS, in his official capacity as the superintendent of the Department of Police, City of New Orleans; KEVIN W. WILDES, in his official capacity as chairman of the City Civil Service Commission for the City of New Orleans,

      Defendants - Appellees

CITY CIVIL SERVICE COMMISSION FOR THE CITY OF NEW ORLEANS, PARISH OF ORLEANS,

      Defendant Cross Claimant - Appellant – Appellee

No. 14-30444

Appeals from the United States District Court
for the Eastern District of Louisiana

Before DAVIS and CLEMENT, Circuit Judges, and ROSENTHAL, District Judge.*

EDITH BROWN CLEMENT, Circuit Judge:

Plaintiffs Frederick Morton and Walter Powers, Jr., individually and in his capacity as President of the Fraternal Order of Police, and cross-claimant the New Orleans Civil Service Commission ("CSC") appeal the district court's judgment upholding certain ordinances passed by the City of New Orleans ("the City") related to paid detail for officers of the New Orleans Police Department ("NOPD"). For the reasons to be explained, we AFFIRM.

I

In *United States v. City of New Orleans*, 731 F.3d 434 (5th Cir. 2013), this court approved a Consent Decree entered into by agreement between the United States and the City of New Orleans. The Consent Decree was the product of a nearly year-long United States Department of Justice ("DOJ") investigation into the NOPD, initiated at the request of Mayor Mitch Landrieu, which "revealed longstanding patterns of unconstitutional conduct and bad practices and policies within the department." *Id.* at 436. As relevant here, the DOJ found that the structure of NOPD's system of paid detail—private security work performed by off-duty NOPD officers for third parties[1]—

---

* District Judge of the Southern District of Texas, sitting by designation.

[1] The New Orleans Police Department Operations Manual in place at the time of the Consent Decree defined paid detail as "[t]he off-duty employment, for compensation, of any employee of the Department by another individual, business, establishment, or organization where the employee is performing the duties of a police officer or a function of the police department." Challenged Ordinance 25428 refers to "paid details" as "secondary employment" and defines such work as "security or police-related work performed for compensation by an NOPD officer or employee during his or her off-duty hours."

undermined the quality of NOPD policing and facilitated abuse and corruption by officers.

To fix the problems associated with paid details, the Consent Decree required the City to "completely restructure" the existing system in which NOPD officers negotiated details and received payment directly from private employers. Among other reforms, the Consent Decree mandated the development of an independent, civilian-run Secondary Employment Coordinating Office ("Coordinating Office") to arrange and coordinate details. An NOPD officer may register with the office to perform paid detail work and, if the officer qualifies, he will be matched with an assignment based on a rotation system that takes into account the officer's primary work schedule and how many hours of paid detail he has worked that year. The Consent Decree also forbids NOPD officers from "solicit[ing] secondary compensation or employment" and provides that private employers seeking to hire NOPD officers for paid detail work must go through the Coordinating Office. The Coordinating Office is directed to work with the NOPD and the City to "develop and implement an auditable payment system" for NOPD officers to receive detail pay.

To comply with the directives of the Consent Decree, the New Orleans City Council established the Office of Police Secondary Employment ("OPSE") and passed Ordinance 25428 setting hourly rates for detail work performed by NOPD officers.[2] The ordinance also provides that OPSE may charge private employers an administrative fee to cover the costs of the new centralized detail system.[3] The City Council concurrently passed Ordinance 25429, which

---

[2] Ordinance 25428 amended Sections 90-121 and 90-122 of the New Orleans City Code.

[3] The administrative fee may not exceed the lesser of 15% of the hourly rate of the officer or $5. Fees collected in excess of the amount required to cover OPSE's yearly costs are refunded to the officers in proportion to the detail hours they worked that year.

created the "Police Secondary Employment Fund" to collect all revenue from the operation of the OPSE and fund the office.[4]

Morton and Powers filed a petition in the civil district court for the Parish of Orleans naming as defendants the City; the CSC and its chairman; Mayor Landrieu; and the Superintendent of the NOPD, Ronal Serpas. The petition alleged that the paid detail ordinances—specifically the hourly pay rates established in Ordinance 25428—violated the United States Constitution and Louisiana Constitution, and sought declaratory and injunctive relief.[5] Specifically, plaintiffs claimed that the city-mandated officer pay schedules (1) usurped the CSC's exclusive power under the Louisiana Constitution and state statutes to establish pay rates for NOPD officers; (2) violated the Contract Clauses of the United States and Louisiana Constitutions; and (3) violated Louisiana's constitutional prohibition on taking a private business entity for the purpose of stymying competition with a government enterprise.

The City removed the case to federal court and, upon inquiry of the district court, the CSC filed notice that it consented to removal. The United States intervened. Plaintiffs filed a motion to remand the case to state court. Perplexingly, the CSC, three days after submitting its consent to removal, moved to dismiss, or, in the alternative, remand, plaintiffs' claims for lack of subject-matter jurisdiction. The district court denied the motions, concluding

---

[4] Ordinance 25429 is codified in Sections 70-415.244–246 of the New Orleans City Code.

[5] The petition refers to "a series of ordinances . . . believed to be 17271 [sic] M.C.S. 90-121 and 90-122, relative to a pay plan for police officers who work paid off-duty security secondary employment, a/k/a, paid details." Although the petition references multiple ordinances, it appears to challenge only Ordinance 25428, which established the complained-of pay schedule and amended New Orleans City Code Sections 90-121 and 90-122. The petition does not mention the Police Secondary Employment Fund, the subject of Ordinance 25429. Because the district court construed the petition as challenging both ordinances and it makes no difference to the outcome of the appeal, we will also assume that plaintiffs' arguments apply to Ordinance 25429.

that it had federal-question jurisdiction over plaintiffs' federal constitutional claim pursuant to 28 U.S.C. § 1331, and could exercise supplemental jurisdiction over plaintiffs' state constitutional claims pursuant to 28 U.S.C. § 1367.

After its motion to dismiss plaintiffs' claims was denied, the CSC filed a cross-claim against the City seeking a declaratory judgment that Ordinance 25428 was unconstitutional because the Louisiana Constitution endows the CSC with exclusive authority to set pay rates for civil servants. The district court held a hearing on plaintiffs' motion for a preliminary injunction, in which the CSC participated. The court denied plaintiffs' motion, finding that the CSC lacked jurisdiction over NOPD officers' paid detail work; the ordinances did not violate the state or federal Contract Clauses because, even if contracts between the officers and private employers existed, they were subject to approval by the Superintendent and the ordinances were a legitimate exercise of the City's police power; and the ordinances did not violate Louisiana's Anti-Expropriation Clause because NOPD officers working paid details were not a "business enterprise," and, in any case, the OPSE, a non-profit entity, did not compete with any paid detail business.

All parties proceeded to a three-day bench trial. Following the trial, the district court issued its findings of fact and conclusions of law and dismissed plaintiffs' claims and the CSC's cross-claim. The court concluded that plaintiffs did not have any existing contracts for paid detail work when the ordinances were passed and that NOPD officers could not form a business enterprise to manage paid details. The court also reaffirmed its holding that the CSC did not have jurisdiction over NOPD paid details.

Plaintiffs and the CSC appeal the district court's rulings on all claims and further allege that the district court lacked jurisdiction over the case.

No. 14-30444

II

"We review questions of subject matter jurisdiction *de novo*." *Borden v. Allstate Ins. Co.*, 589 F.3d 168, 170 (5th Cir. 2009). A district court's decision to exercise supplemental jurisdiction over pendent state law claims is reviewed for abuse of discretion. *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 158 (5th Cir. 2011).

Plaintiffs argue that the district court lacked jurisdiction over their claims because the CSC did not consent to removal. This assertion is meritless. A defendant may remove a case to federal court if it contains a federal claim and all defendants consent to removal. 28 U.S.C. § 1441(c)(1); *id.* § 1446(a)-(b); *see also Harris v. Edward Hyman Co.*, 664 F.2d 943, 944 n.3 (5th Cir. 1981) (explaining that the federal removal statute has been interpreted to require that all defendants join in the removal petition). As the district court found, the City could remove the case because plaintiffs' petition explicitly alleged a claim under article I, section 10 of the United States Constitution. Plaintiffs' contention that the CSC never consented to removal is defied by the record. The rule of unanimity requires that all defendants to an action either sign the original petition for removal *or* timely file written consent to the removal. *Getty Oil Corp. v. Ins. Co. of N. Am.*, 841 F.2d 1254, 1262 n.11 (5th Cir. 1988). Although the CSC did not sign the removal petition, it subsequently filed written consent to removal within thirty days of service of the state-court petition. *See* 28 U.S.C. § 1446(b)(2)(B). The CSC's timely written consent clearly satisfies § 1446.[6]

---

[6] Plaintiffs also claim that the district court did not have jurisdiction over their petition under the civil rights removal statute, 28 U.S.C. § 1443. Because the district court did not exercise its jurisdiction pursuant to that statute, this jurisdictional challenge is inapposite.

6

The CSC also challenges the district court's jurisdiction over its cross-claim on the grounds that the court abused its discretion by exercising supplemental jurisdiction over what the CSC contends is a novel issue of state law.  It is axiomatic that a district court may exercise supplemental jurisdiction over a cross-claim under 28 U.S.C. § 1367.  *See, e.g.*, *Zurn Indus., Inc. v. Acton Constr. Co.*, 847 F.2d 234, 236-37 (5th Cir. 1988).  A district court, however, "*may* decline to exercise supplemental jurisdiction over a claim . . . if . . . the claim raises a novel or complex issue of State law."  28 U.S.C. § 1367(c)(1) (emphasis added).

As an initial matter, the CSC has waived its challenge to the district court's discretionary exercise of supplemental jurisdiction over its cross-claim because it failed to object in that court.  *See, e.g.*, *Acri v. Varian Assoc., Inc.*, 114 F.3d 999, 1000-01 (9th Cir. 1997) (en banc) ("[W]hile Article III jurisdiction must be considered *sua sponte*, review of the discretionary aspect to supplemental jurisdiction under § 1367(c) is waived unless raised in the district court."); *Doe v. District of Columbia*, 93 F.3d 861, 871 (D.C. Cir. 1996) (same).  To the contrary, the CSC consented to removal to federal court and then—after attempting to dismiss or remand the case for lack of federal jurisdiction—filed its cross-claim in the district court.  Whatever the CSC now seeks to make of its erratic behavior, there is no question that it has waived any argument over the district court's exercise of supplemental jurisdiction over its cross-claim.

In any case, the district court did not abuse its discretion.  In determining the propriety of a district court's exercise of supplemental jurisdiction, "we look to the statutory factors set forth by 28 U.S.C. § 1367(c), and to the common law factors of judicial economy, convenience, fairness, and comity."  *Enochs*, 641 F.3d at 158-59.  The CSC argues that its claim of exclusive jurisdiction over hourly rates for paid details under the Louisiana

No. 14-30444

Constitution raises a novel issue of state law. But, although the facts underlying the CSC's state constitutional claim may be novel, the question presented—whether the CSC has jurisdiction over paid details—has been addressed and rejected by multiple Louisiana appellate courts. Moreover, it is clear that the statutory and common-law factors weigh in favor of exercising jurisdiction. The CSC's jurisdictional claim was premised on the same set of facts—the creation of OPSE and institution of a fee schedule for paid details—as plaintiffs' federal Contract Clause claim.

The City reformed the paid detail system to implement the Consent Decree, and the district court had presided over the entry and implementation of the judicial settlement for more than a year by that point. Accordingly, the district court's substantial familiarity with the factual background of plaintiffs' and the CSC's claims, including its understanding of the transformation of the structure of the paid detail system, clearly placed considerations of judicial economy and convenience in favor of exercising supplemental jurisdiction. *See Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602-03 (5th Cir. 2009) (stating that it would have been an abuse of discretion for the district court *not* to exercise supplemental jurisdiction over state-law claims, even if the claims presented novel or complex issues, because the court had invested a "significant amount of judicial resources" in the case). The CSC makes no argument as to the remaining common-law or statutory factors and none could tip the balance in favor of refusing to exercise jurisdiction over the CSC's counter-claim. The district court did not err, much less abuse its discretion, in adjudicating the CSC's claim under the Louisiana Constitution.

III

Plaintiffs first allege that the City's imposition of a mandatory pay rate for detail work violates the Contract Clauses of the United States and Louisiana Constitutions. Article I, section 10, clause 1 of the United States

Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." Louisiana's Constitution similarly states that "[n]o . . . law impairing the obligation of contracts shall be enacted." La. Const., art. I, § 23. These constitutional clauses are "substantially equivalent" and we apply the same analysis to plaintiffs' state and federal claims. *See Bd. of Comm'rs of Orleans Levee Dist. v. Dep't of Natural Res.*, 496 So. 2d 281, 291 (La. 1986).

We utilize a three-part test to determine whether a municipal ordinance violates the Contract Clause. *See Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 504 (5th Cir. 2001).[7] "First, the threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Id.* (internal quotation marks and alterations omitted) (quoting *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983)). If the ordinance substantially impairs contractual rights, the government must articulate "a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." *Energy Reserves Grp.*, 459 U.S. at 411-12 (internal citation omitted). "Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Id.* at 412 (internal quotation marks and alterations omitted). If the contract impaired by the ordinance is between two private parties, the court "does not independently review the reasonableness of the legislation,"

---

[7] The United States Constitution's prohibition on the impairment of contracts applies to a state's subdivisions. *See, e.g.*, *Atl. Coast Line R. Co. v. City of Goldsboro*, 232 U.S. 548, 555 (1914).

but instead "defer[s] to the judgment of the legislature." *Lipscomb*, 269 F.3d at 505.

The district court held that neither Powers nor Morton had a contract to perform or coordinate paid detail work when the ordinances went into effect. Under Louisiana law, "[t]he existence or non-existence of a contract is a question of fact." *Matherne v. Barnum*, 2011-0827 (La. App. 1 Cir. 3/19/12); 94 So. 3d 782, 787; *see also Preston Law Firm, L.L.C. v. Mariner Health Care Mgmt. Co.*, 622 F.3d 384, 390-91 (5th Cir. 2010) (reviewing the district court's holding that no compromise contract existed under clear error standard pursuant to Louisiana law).  We review the district court's findings of fact in a bench trial for clear error.  *Gebreyesus v. F.C. Schaffer & Assocs., Inc.*, 204 F.3d 639, 643 (5th Cir. 2000).

"A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. Civ. Code art. 1906.  "An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee." La. Civ. Code art. 1756.  "Both parties must be bound in order for there to be a contract." *Leger v. Tyson Foods, Inc.*, 95-1055 (La. App. 3 Cir. 1/31/96); 670 So. 2d 397, 401.

The district court easily concluded that there was no evidence in the record that Powers had any existing contracts to perform or coordinate details when the ordinances were enacted.  The court found that Morton had executed a "series of oral contracts" with John Cummings, the owner of the Sugar Mill, pursuant to each of which Morton was bound to coordinate security for an event and Cummings was bound to pay him an agreed-upon rate.  The court determined that Morton and Cummings also had an understanding that Morton would coordinate security for all events at the Sugar Mill, but that there was no obligation on the part of either party to provide or accept work.  Accordingly, the court held that the parties did not intend to create mutual

obligations for all future security jobs, but merely had "a prior course of dealing that established a hope they would continue to work together in the future and established rates of pay in the event they did."

The district court did not clearly err in concluding that no contract existed at the time the ordinances were enacted.[8]  To be sure, there is some evidence from which the court could have found to the contrary.  For "six to seven years," Morton coordinated details for most events at the Sugar Mill.  If the Sugar Mill did not intend to use Morton to coordinate security for an event, the owner called Morton to explain why, and Morton "knew that it was for that one occasion."  There was no testimony that Morton ever refused an assignment, except during a six-month period in which he was suspended from coordinating or working details.  Morton told Cummings that he could not coordinate security during this time and Cummings testified that he considered his unavailability analogous to "sick leave" and instructed Morton to "call [him] when we could renew the agreement."

But although Morton testified that he believed the Sugar Mill would be in breach of contract if it refused to offer him an assignment, the evidence presented as to the parties' prior dealings was that Cummings occasionally did not use Morton as a coordinator and would simply call Morton to tell him so. There is no evidence that Cummings intended to be bound to use Morton indefinitely as a detail coordinator for all future events.  Nor is there evidence that Morton believed he would be liable to Cummings if he refused an assignment, as he in fact was forced to do for six months.  Thus, while there was certainly an understanding that Morton would be Cummings' primary option to coordinate security for Sugar Mill events, the district court did not

---

[8] The district court held that plaintiffs lacked standing to assert Contract Clause claims on behalf of other NOPD officers and plaintiffs have not challenged that ruling on appeal.  In any case, these claims would also fail for the reasons explained below.

clearly err in finding that neither party intended to be bound—and thus, no contract existed—until an assignment for a specific event was offered and accepted.[9]

Even assuming, however, that the ordinances substantially impaired paid detail contracts of NOPD officers, the ordinances would not be invalidated under the federal or state Contract Clauses because they were a reasonable exercise of the City's police power. The City, through Mayor Landrieu, requested that the DOJ conduct an investigation of the NOPD to reform the department. The investigation found a longstanding pattern of illegal and unconstitutional conduct by NOPD officers. The DOJ attributed this misconduct to a "wide swath of City and NOPD systems and operations," including the paid detail system. With respect to paid details, the DOJ concluded that there were "few aspects of NOPD more broadly troubling" and that the system "had a corrupting effect on the [d]epartment" and contributed to "poor" and "inequitable" policing. Specifically, the investigation found, *inter alia*, that the officer-negotiated paid detail system led to officers abandoning their official duties in favor of detail work, preferential treatment for private employers, officer fatigue, extortion of private businesses, lack of policing in

---

[9] Plaintiffs do not argue that they had a property interest in privately-negotiated detail work and therefore we do not address the issue. We note, however, that a number of district courts have held that police officers and detectives do not have a property interest in secondary employment. *See, e.g.*, *Novak v. City of Pittsburgh*, 2006 WL 3420959, at *3 (W.D. Pa. Nov. 27, 2006) (holding that police department's creation of a centralized office to administer traffic details did not deprive officers who previously coordinated such details of a property interest); *Decker v. City of Hampton, Va.*, 741 F. Supp. 1223, 1226 (E.D. Va. 1990) (holding that a detective did not have a property interest in working as a detective in his off-duty hours); *Fort Wayne Patrolmen's Benevolent Ass'n, Inc. v. City of Fort Wayne*, 625 F. Supp. 722, 731-32 (N.D. Ind. 1986) (holding that police officers do not have a property right to paid details because the officers could be fired by the private employers at any time); *see also State Troopers Non-Commissioned Officers Ass'n of New Jersey v. New Jersey*, 399 F. App'x 752, 756 (3d Cir. 2010) (holding that state troopers did not have a property interest in secondary employment as lawyers despite attending law school during their employment as state troopers with a subsidy from the state).

certain neighborhoods, and undermined the chain of command by permitting lower-ranking officers to act as detail coordinators for higher-ranking officers.

The challenged ordinances were passed to create an independent, centralized detail system to alleviate the problems created by the prior system. There is no question that stemming police misconduct and improving the quality of policing benefits the entire citizenry of New Orleans and qualifies as a "significant and legitimate public purpose." It is also clear that any impairment of officer-negotiated detail contracts effected by the ordinances was "reasonable and necessary" to accomplish the intended reforms. *See Lipscomb*, 269 F.3d at 505. In fact, the creation of an independent oversight body like the OPSE and establishment of an hourly pay schedule were recommended by then-NOPD Superintendent Serpas as part of a "complete and total overhaul of the paid detail system." The new structure of the administration of paid details abolishes the effectively unregulated free-market system that the partnership between the City and the DOJ identified as the institutional source or contributor of many of the NOPD's deficiencies, but it does not completely deprive NOPD officers of the opportunity to work details. Plaintiffs offer no argument as to how more modest reforms could remedy the problems identified by the City, nor would any argument be persuasive in light of judicial deference to the judgment of the legislature. *See id.* ("In cases involving impairment of contracts between private parties, the court does not independently review the reasonableness of the legislation; it should defer to the judgment of the legislature.").

We affirm the district court's dismissal of plaintiffs' state and federal Contract Clause claims.[10]

---

[10] Plaintiffs also allege that the district court erred by requiring them to show irreparable injury to their contractual interests to obtain a preliminary injunction. The district court, however, denied the motion on the grounds that plaintiffs could not

No. 14-30444

IV

Plaintiffs also allege that the ordinances violate the Louisiana Constitution's anti-expropriation prohibition. Article 1, section 4(B)(6) of the Louisiana Constitution provides that "[n]o business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting competition with a government enterprise." Plaintiffs' argument is frivolous. The NOPD regulations previously in place expressly prohibited officers "from forming any corporation . . . for the purpose of billing, receiving compensation, or offering services of paid details." Indeed, Morton received a six-month suspension from paid detail privileges for violating this rule. NOPD officers could not form a business enterprise related to paid detail work and therefore have no claim under the Anti-Expropriation Clause. We also affirm the district court's dismissal of this claim.

V

Finally, the CSC contends that it has exclusive jurisdiction over the pay rates of civil service employees and thus claims that the City had no authority to set a mandatory hourly wage schedule for NOPD paid detail work.[11] Article X, section 1(B) of the Louisiana Constitution establishes the "City Civil Service," which "includes all persons holding offices and positions of trust or employment in the employ of each city having over four hundred thousand population." The Constitution also mandates that cities of that size create a "city civil service commission." La. Const. art. X, § 4(A). "Each commission is vested with broad and general rulemaking . . . powers for the administration

---

demonstrate any likelihood that they would succeed on the merits of their claims. Moreover, plaintiffs did not appeal the denial of the preliminary injunction, and the district court found after the bench trial that plaintiffs could not succeed on their constitutional claims. Their objection is thus not only factually inaccurate but also moot.

[11] Plaintiffs also brought this claim in their petition but have abandoned it in favor of the CSC on appeal.

14

and regulation of the classified service." *Id.* art. X, § 10(A)(1)(a). This includes the power to "adopt rules for regulating employment" and "to adopt a uniform pay and classification plan." *Id.*

The CSC's rules define the "Civil Service of the City" as "all offices and positions of trust or employment with the city." CSC Rule I § 1.14. A "position" with the City is "any office or any employment, in the service of the city." *Id.* § 1.52.

The district court correctly concluded that the CSC does not have jurisdiction over NOPD paid details. By the plain language of the Louisiana Constitution, as mirrored by the CSC rules, the CSC's jurisdiction is limited to "positions of trust or employment *in the employ of [the] city*." La. Const. art. X, § 1(B) (emphasis added). The definition of "secondary employment," as paid detail is referred to in the ordinances and Consent Decree, is "security or police-related work performed for compensation by an NOPD officer or employee during his or her off-duty hours." The Consent Decree explicitly prohibits an officer from working details for the City. *See* Consent Decree, ¶ 362 ("Secondary employment for City departments and agencies shall be prohibited."). The CSC simply has no support for its claim that it has the authority to set officer pay schedules for off-duty work performed for private employers.

Although the CSC frames its claim as one of first impression, the issue is not new. Two Louisiana Courts of Appeals have already held that the CSC does not have jurisdiction over paid details. In *Sterling v. Board of Commissioners, Port of New Orleans*, the First Circuit of the Louisiana Court of Appeals held that special detail pay earned by New Orleans harbor policemen did not constitute "wages or salaries" earned for official duties and the State CSC did not have jurisdiction over a fund created by Harbor policemen to administer the detail revenue. 527 So. 2d 1122, 1124-25 (La. Ct.

App. 1988). The First Circuit further held that, although Harbor policemen working paid details must comply with regulations for on-duty officers, detail employment is private, not civil service, and thus concluded that the State CSC lacked jurisdiction over suspensions from paid detail work. *Id.* at 1125. Similarly, in *Hebert v. New Orleans Police Department*, the Fourth Circuit of the Louisiana Court of Appeals held that paid detail is the "off-duty employment of officers" and thus "any suspension of detail privileges is beyond the [CSC]'s constitutional grant of jurisdiction." 2001-1165 (La. App. 4 Cir. 12/19/01); 805 So. 2d 345, 352, *writ denied*, 2002-0243 (La. 3/22/02); 811 So. 2d 932.

The CSC contends that, even if it did not have jurisdiction over paid details when they were coordinated and approved entirely within the NOPD, it does now that the system is administered and overseen by the OPSE. The district court rejected this argument, holding that "[s]econdary employment after approval of the Consent Decree, even as modified by the Challenged Ordinances and overseen by OPSE, is still work at the officer's election for private non-City entities while off-duty." We agree with the district court that moving administration and supervision of paid detail work from the NOPD to the OPSE does not transform paid detail work into a position of trust or employment with the City.

The CSC challenges the district court's holding on four grounds. First, the CSC alleges that it is inapposite that the officer "elects" to perform paid detail work because once he does so he is subject to—and can be disciplined for violations of—NOPD's code of conduct. This argument fails in the first instance because NOPD officers working details have always been subject to the same NOPD rules applicable to on-duty officers. *See* New Orleans Police Department Operations Manual, Ch. 22.8, ¶ 30 ("While working paid details, employees shall be governed by all Department rules, orders and procedures.").

No. 14-30444

The First Circuit in *Sterling* explicitly rejected the proposition that mandatory compliance with police department regulations transforms private detail employment into civil service employment subject to the CSC's authority. *See Sterling*, 527 So. 2d at 1125.[12] An officer performing detail work must conduct himself in accordance with NOPD rules because he is representing the department and utilizing the police power that the City has bestowed upon him. But it does not follow that the exercise of this power for a *private* employer constitutes *public* employment. When an officer is performing paid detail work his duties are directed by the private citizen or entity, not the City. It is clear that, as the Court of Appeals held in *Sterling*, the optional nature of off-duty details places the assignments outside the jurisdiction of the CSC.

The CSC also contends that an officer working a paid detail is not simply working for a private party because in doing so he is exercising his police power, which in turn serves a public function. But although the officer may be exercising his authority as a peacekeeper, it is for the narrow purpose of serving his private employer; his direction comes from the employer, not the City. Accordingly, even if the performance of a detail assignment creates a positive externality for the public at large, such benefits do not transform the job from private employment into employment with the City.

Third, the CSC contends that because the administration of the paid detail system is now handled by the OPSE, detail work is no longer "off-duty" employment. This change is immaterial. Although detail work was previously

---

[12] If disciplinary action imposed for an officer's conduct on paid detail affected the officer's primary employment (i.e. more than a suspension of paid detail privileges), the CSC would have jurisdiction to hear the officer's appeal from the sanction. *See* La. Const. art. X, § 12(B) ("Each city commission . . . shall have the exclusive power and authority to hear and decide all removal and disciplinary cases . . . ."); *see also, e.g.*, *Butler v. New Orleans Police Dep't*, 2003-2180 (La. App. 4 Cir. 10/6/04); 885 So. 2d 1266, 1267 n.2 (noting that the CSC had jurisdiction to hear the appeal of an officer terminated for off-duty conduct).

reviewed in-house at the NOPD, the police department is still an agency of the City and the CSC does not explain why approval by the OPSE renders the City the detail employer when the NOPD was not. As the district court noted, detail assignments were previously coordinated by NOPD officers themselves, yet the CSC does not contend that a coordinating officer was the "employer" of the officers performing the detail work. That a centralized office now coordinates detail assignments does not make the City the officer's employer. Although officers are matched with detail assignments by the OPSE (according to an algorithm), the assignments come from private employers, not the OPSE itself. Likewise, although wages earned for detail work now pass through the OPSE for distribution to the officers, those wages are paid by the private third party, not the City.[13]

Finally, the CSC argues that paid detail must be employment by the City because otherwise the City has no authority to establish a rate of pay for detail work and is thus illegally imposing a "minimum wage" upon the private third-party employer. This argument fails initially because it was not raised in the district court. *See Celanese Corp. v. Martin K. Eby Constr. Co.*, 620 F.3d 529, 531 (5th Cir. 2010). It is also meritless. The pay schedule is not a generally applicable minimum-wage law governing employer-employee relationships, but merely a condition for the private, off-duty employment of an NOPD officer exercising the power of his badge. A private party does not have the legal right to hire an NOPD officer for its own personal benefit; details are permitted at the City's discretion. If a private party does not want to pay the rates the City has established, or comply with any of the City's other rules for detail service,

---

[13] Even if the Police Secondary Employment Fund could be considered part of the City's treasury, this would not transform paid detail work into employment with the City. *See* CSC Rule I, § 1.14 (providing that the determination of whether offices or positions are employment with the City is made "irrespective of whether the pay for the offices and positions of trust or employment be paid out of the city treasury either in whole or in part").

it may hire any other security personnel it wishes. The pay schedule is simply another regulation with which a private third party must comply to obtain the City's permission to use its officers to provide private security; it does not make the City the officer's employer for a job offered, planned, and paid for by a third party. *Cf.* 29 C.F.R. § 553.227(a), (d) (explaining that police detail work performed for a "separate and independent employer" does not count as hours worked for the municipality for purposes of overtime compensation under the Fair Labor Standards Act even though the municipality may "select the officers for special details from a list of those wishing to participate, *negotiate their pay*, and retain a fee for administrative expenses" (emphasis added)).[14]

Because the City, not the CSC, has the exclusive jurisdiction to set wage rates for NOPD paid details, we affirm the district court's dismissal of the CSC's cross-claim.

## VI

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[14] Section 154-1658(a) of the New Orleans City Code provides that a parade organizer may be required to pay up to ten officers working parade detail at the NOPD overtime rate. The CSC argues that the City can ignore its authority to set the overtime rate and require that the organizers instead pay the new detail rate. But the fact that the City in this specific instance requires a private employer to pay the overtime rate instead of the detail rate does not bring this off-duty detail work under the jurisdiction of the CSC. It is up to the City to determine rates for paid detail work (if it chooses to do so), and to the extent that the pay schedule in Ordinance 25428 conflicts with the overtime rate established for parade detail in Section 154-1658(a), it is the City's decision which statute takes precedence—it does not concern the CSC.