**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**July 9, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

ANTHONY P. TUFARO, D.D.S.,
M.D., F.A.C.S.,

     Plaintiff - Appellant,

v.

THE STATE OF OKLAHOMA EX
REL.  BOARD OF REGENTS OF
THE UNIVERSITY OF
OKLAHOMA; JASON R. SANDERS,
M.D., MBA, in his individual and
official capacities as the Senior Vice
President and Provost; JOHN P.
ZUBIALDE, M.D., in his individual
and official capacities as the
Executive Dean of the College of
Medicine; BARISH H. EDIL, M.D.,
F.A.C.S., in his individual and official
capacities as Chair of the
Department of Surgery,

     Defendants - Appellees.

No. 23-6039

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:20-CV-01138-J)**
_____

Shannon F. Davies, Spencer Fane, LLP (Courtney D. Powell, with her on the
briefs), Oklahoma City, Oklahoma, for Appellant.

M. Daniel Weitman, University of Oklahoma Office of Legal Counsel (Tina S. Ipka and John C. Curtis, III, with him on the brief), Norman, Oklahoma, for Appellees.

_____

Before **HARTZ**, **McHUGH**, and **FEDERICO**, Circuit Judges.

_____

**FEDERICO**, Circuit Judge.

From 2017 to 2019, Dr. Anthony Tufaro served as Chief of Plastic & Reconstructive Surgery and Professor of Medicine at the University of Oklahoma ("OU"). In 2019, OU gave Tufaro notice that his contract would not be renewed. Following his departure from OU, Tufaro filed a wrongful termination lawsuit in state court against OU and three OU doctors in his chain of command (the "Individual Defendants"; together with OU, "Defendants"). Generally, he alleges that Defendants terminated him because he was exposing a range of discrepancies and misconduct within OU's Medical and Dental Colleges.

Tufaro's case was removed to federal court and, ultimately, none of his claims advanced past summary judgment. Tufaro now appeals several of the district court rulings that ended his case against Defendants.

**I**

In March 2017, OU offered Tufaro a "consecutive term" faculty position to serve as Professor of Surgery and Chief of Plastic and Reconstructive Surgery. His offer letter, which he and OU both signed, stated that he would

2

be responsible for a range of research, teaching, clinical, supervisory, and administrative duties.

In September 2017, OU's Board of Regents formally approved Tufaro's appointment and sent him a contract for employment as a non-tenured faculty member. Under the contract terms, Tufaro was "eligible" for consecutive annual term appointments with no restriction on the number of terms he could serve. Aplt. App'x III at 128-29. Tufaro signed the contract on October 3, 2017.

Tufaro's contract also specifically incorporated and made Tufaro's employment subject to the OU Health Sciences Faculty Handbook (the "Handbook"). The 2017 Handbook, which was in effect at the time, stated that "[c]onsecutive term appointments are automatically renewed for the next fiscal year unless notification of non-renewal is given[.]" Aplt. App'x I at 39. The Handbook also included a notice period for any "non-renewal" that increased upon each year of employment at OU. For example, in year one, the Handbook guaranteed Tufaro 90 days' notice before any non-renewal could take effect and, in year two, guaranteed at least 180 days' notice.

Under Tufaro's OU employment agreement, Tufaro's appointment renewed automatically in October 2018. In January 2019, he began to voice internal complaints regarding the following topics:

3

1. billing for unperformed surgical procedures;

2. unsupervised resident surgical procedures;

3. surgical procedures performed outside clinic hours;

4. failing to properly secure medications and drugs;

5. breaches of patient confidentiality; and

6. improper billing and referral protocols by the affiliated oral surgeons employed by OU's College of Dentistry.

Aplt. App'x V at 93.

Throughout early 2019, Tufaro voiced these complaints within OU by writing emails and engaging with OU's compliance department. All of Tufaro's complaint emails were sent from his official OU email address to other official OU email addresses (i.e., OU medical executives, compliance officials, and oral surgeons affiliated with OU's Dental College), and none of Tufaro's complaints, whether by email or in person, traveled outside OU's campus.

Tufaro's immediate supervisor, Dr. Barish Edil, was the Chair of Surgery at OU. Edil raised issues with Tufaro's performance in the written portion of Tufaro's 2019 annual review, written by hand in a box titled "Department Chair action items." Aplt. App'x IV at 225. Tufaro claims these comments were backfilled after his review to justify his termination. Around this time, Edil consulted with an OU in-house lawyer who suggested that OU could end Tufaro's employment using the non-renewal path set forth in the Handbook. Edil recommended this path in a letter to his supervisor, Dr. John Zubialde,

4

the Dean of OU's Medical College. Edil's letter listed four reasons to support non-renewal, citing issues with Tufaro's "[l]ack of professionalism and collegiality[,]" "[i]nsufficient clinical productivity and faculty oversight[,]" "[p]oor leadership in recruitment[,]" and "[d]isregard for proper financial & fiduciary management of his division causing extensive losses to the Department and the Division since he began his term." *Id* at 219.

Zubialde agreed with Edil's suggestion and, in turn, recommended Tufaro's non-renewal to his supervisor, Dr. Jason Sanders. As OU's Senior Vice President and Provost of the Health Sciences Center, Sanders was OU's decisionmaker on this matter. He sent Tufaro a letter in May 2019 providing timely notice of non-renewal of Tufaro's contract. Sanders did not provide any reason or justification to Tufaro, but he did inform him that his employment would end in 180 days, on November 14, 2019, in accord with the notice provision required by the Handbook, § 3.2.7(b). Around six months later, in November 2019, Tufaro exited OU.

To recap, here is the sequence of Tufaro's hiring and departure from OU:



1. **Hiring**. OU hires Tufaro in October 2017.

2. **Internal Complaints**. In January 2019, Tufaro raises complaints on six topics.

3. **Annual Review**. Tufaro's annual review in March 2019 is positive, although Tufaro alleges that Edil backfilled negative comments.

4. **Chair Suggestion**. In March 2019, the Chair of Surgery recommends Tufaro's non-renewal to the Medical College Dean.

5. **Dean Suggestion**. The Dean agrees, and that same month, he recommends Tufaro's non-renewal to the Provost.

6. **Notice of Non-Renewal**. The Provost sends notice of non-renewal to Tufaro in May 2019, providing him 180 days' notice.

7. **Exit from OU**. In November 2019, Tufaro departs OU.

Tufaro further claims that, even after he departed, OU continued to retaliate against him. Tufaro alleges his replacement at OU told Tufaro's subsequent employer that his work was subpar and that he was no longer allowed to work with any OU medical residents. He alleges these two comments smeared his professional reputation and caused him harm.

## II

The next year, Tufaro filed a lawsuit in Oklahoma state court, asserting he was wrongfully terminated.[1] He named as defendants: (1) OU; (2) the Individual Defendants (Edil, Zubialde, and Sanders) in both their official and personal capacities; and (3) three oral surgeons (the "Oral Surgeon Defendants") affiliated with OU's College of Dentistry (who are not at issue in this appeal). Tufaro's Complaint alleged several claims for relief, including federal claims under 42 U.S.C. § 1983 (the § 1983 claims) and Oklahoma state law claims. Four claims from the Complaint are at issue on appeal:

---

[1] The federal district court referred to Tufaro's Oklahoma state court pleading as the "Complaint" (although it was a Petition) because the case was removed to federal court. For consistency, we do the same.

1. First Amendment retaliation under § 1983 (against all Defendants);

2. Fourteenth Amendment deprivation of property and liberty under § 1983 (against all Defendants);

3. Breach of contract (against OU); and

4. Violation of the Oklahoma Constitution, including a *Burk* tort,[2] and a freedom of speech claim under Article 2, § 22 (against OU).

After a notice of removal, the case was transferred to federal court, in the United States District Court for the Western District of Oklahoma.

## A

Once in federal court, Defendants filed a combined motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), which the district court granted in part and denied in part. Regarding the claims against OU at issue on appeal, the district court dismissed:

- all the § 1983 claims, because OU is not a "person";

- the breach of contract claim, because OU followed the Handbook; and

- the freedom of speech claim under Article 2, § 22, of the Oklahoma Constitution, because it does not create a private cause of action.

Tufaro's *Burk* tort claim, however, survived against OU.

Regarding the claims against the Individual Defendants at issue on appeal, the district court dismissed:

---

[2] A *Burk* tort claim for wrongful termination in violation of public policy was recognized in *Burk v. K–Mart Corp.*, 770 P.2d 24 (Okla. 1989). We explore the mechanics of this claim in more detail, *infra*, in section IV.B.2.

- all the § 1983 claims against the Individual Defendants in their official capacities, because they, too, are not "persons";

- the § 1983 First Amendment retaliation claim against Dr. Sanders in his personal capacity, because there was no allegation he was aware of Tufaro's complaints and therefore could not have retaliated based upon them; and

- the § 1983 liberty and property claims against all the Individual Defendants in their personal capacities, for failure to plead an entitlement (property claim) or the elements needed to show harm to reputation (liberty claim).

The § 1983 First Amendment retaliation claim against Zubialde and Edil (two of the three Individual Defendants) in their personal capacities survived the motion to dismiss, and the district court rejected their qualified immunity defenses.

The motion to dismiss order granted Tufaro leave to amend his complaint, and Tufaro filed a First Amended Complaint. Two claims alleged in the First Amended Complaint are now at issue on appeal:

- the § 1983 First Amendment retaliation claim against Dr. Edil and Dr. Zubialde; and

- the *Burk* tort claim against OU.

In the First Amended Complaint, Tufaro omitted, among other claims, the § 1983 liberty claim. In other words, he did not attempt to cure the pleading defects identified by the district court.

9

**B**

The parties then conducted discovery. Tufaro does not allege he was denied any discovery, other than a challenge to a discovery ruling that upheld a deposition objection based on attorney-client privilege.[3]

After discovery, Defendants filed a combined motion for summary judgment. The district court granted that motion and entered summary judgment in favor of Defendants on the § 1983 First Amendment and *Burk* tort claims (along with other claims not at issue on appeal). On the §1983 claim, it ruled that Tufaro's complaints fell outside the scope of the First Amendment because they were made during his employment as part of his official duties (as opposed to a private citizen). On the *Burk* tort claim, it held that Tufaro failed to demonstrate he was an "at-will" employee, an essential element.

---

[3] The deposition question asked Edil about guidance he received regarding Tufaro's non-renewal from an in-house OU lawyer. Although raised by Tufaro as error, we do not reach the merits of this issue. Tufaro fails to connect the discovery ruling or the answer he hoped to obtain in the deposition to any of his claims for relief. He also does not explain how the deposition answer would have affected any of his claims. Without more, Tufaro's argument fails to get out of the starting block. *See Cahill v. Am. Fam. Mut. Ins. Co.*, 610 F.3d 1235, 1238 (10th Cir. 2010) (explaining that we will not "construct arguments" or "fill the gaps in undeveloped arguments").

10

Following the entry of summary judgment on all remaining claims, the district court entered final judgment, ending Tufaro's case.

Tufaro filed a timely notice of appeal. We have jurisdiction under 28 U.S.C. § 1291.

## III

"We review de novo a district court's grant of a 12(b)(6) motion to dismiss," *Johnson v. Reyna*, 57 F.4th 769, 774 (10th Cir. 2023), and apply "the same legal standard as the district court." *Jordan–Arapahoe, LLP v. Bd. of Cnty. Comm'rs*, 633 F.3d 1022, 1025 (10th Cir. 2011).

In reviewing a Rule 12(b)(6) motion, "[w]e accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable" to the nonmovant. *Johnson*, 57 F.4th at 774. To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at 774-75 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In contrast, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678.

11

We also review the grant of summary judgment de novo and apply the same standard that applies in the district court. *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1168 (10th Cir. 2023). Under Rule 56, summary judgment is appropriate if there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden to show the absence of a genuine issue of material fact, and, if successful, the burden then shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). At summary judgment, a court does not weigh the evidence or make credibility determinations, *Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1052 (10th Cir. 2023), and all facts and reasonable inferences are viewed "in the light most favorable to the nonmoving party[.]" *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 980 (10th Cir. 2022).

**IV**

**A**

We first review the Rule 12(b)(6) rulings against Tufaro. The district court granted in part and denied in part the motions to dismiss. Tufaro seeks reversal on the § 1983 claims against Defendants and two state law claims against OU (breach of contract and the *Burk* tort claim). We begin with the state law claims against OU.

12

**1**

On the claim for breach of contract, Tufaro contends that OU breached his contract by "terminating" him in violation of the Handbook.

However, before we reach the elements of the breach of contract claim, we first take a detour to address Tufaro's argument about the contract itself. In the Complaint, Tufaro identified by name, cited, and discussed the Handbook. Tufaro's employment contract with OU, signed in October 2017, included a link to an online copy of the Handbook and stated that, by signing the contract, Tufaro acknowledged receipt of the Handbook. However, despite its centrality to this claim, Tufaro did not attach the Handbook to his Complaint.

Nor did Defendants attach the Handbook to their motion to dismiss. Requiring the Handbook to analyze the claim, the district court took judicial notice of an online 2017 version of the Handbook. Tufaro argues this was error.

We disagree. A district court may consider a document outside the four corners of a complaint in deciding a Rule 12(b)(6) motion if the document is (1) "central" to the plaintiff's claim, (2) "referred to" in the complaint, and (3) free of any genuine dispute over its "authenticity[.]" *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253–54 (10th Cir. 2005).

The Handbook meets all three factors. First, the OU Handbook was "central" to Tufaro's breach of contract claim; indeed, he relied on the language

13

of the Handbook repeatedly. Next, the Handbook was "referred to" repeatedly by name, cited, and discussed in the Complaint. And, finally, Tufaro concedes the authenticity of the Handbook: "Dr. Tufaro is not challenging the authenticity of *all* Faculty Handbooks used throughout this litigation. Dr. Tufaro is challenging the application of provisions from a Faculty Handbook that may not contain the same provisions as the one at issue." Reply Br. at 16.

Tufaro says the district court improperly corrected his version of the Handbook's language because, at the Rule 12(b)(6) stage, all facts alleged in the Complaint must be taken as true. But as we have explained, "[f]actual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true." *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1145 (10th Cir. 2023) (quoting *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997)).

Tufaro used ellipses to selectively quote portions of the Handbook, which erased the distinction between termination and non-renewal, and we affirm the district court's corrections to this language. It was Tufaro who first introduced the Handbook by naming, citing, and discussing it in the Complaint to bolster his claim. In supplying the full language, the district court did not draw inferences in favor of OU; it simply provided the text of the Handbook that Tufaro's ellipses had omitted. Notably, Tufaro does not argue that the

14

language supplied by the district court is inaccurate or not included in the Handbook.

In any event, Tufaro's evidentiary challenge never moves beyond a hypothetical possibility. The parties conducted full discovery and Tufaro never claims he was unable to obtain other copies of the Handbook. Yet at oral argument, Tufaro admitted that he has not put forward any other version of the Handbook for us to compare, nor could he point to any material difference in the language of any of the Handbooks; he raises only the possibility that different versions of the Handbook might have contained different language regarding termination and non-renewal. That is not sufficient.

There may be circumstances where judicial internet searches for relevant evidence may lead a court astray; however, there is no reason to conclude that happened here. We affirm the district court's decision to use – and accurately quote – the Handbook in its Rule 12(b)(6) analysis of the breach of contract claim.

Returning to the merits of the breach of contract claim, Tufaro contends his "termination" breached the terms of the Handbook and that the district court failed to construe the facts alleged in his favor. Under Oklahoma law, this claim has three elements: "(1) formation of a contract; (2) breach of the contract; and (3) damages as a result of that breach." *Morgan v. State Farm Auto. Ins. Co.*, 488 P.3d 743, 748 (Okla. 2021). A breach of a contract "occurs

15

when a party fails to perform a duty arising under or imposed by agreement." *Sharp v. State Farm Mut. Auto Ins. Co.*, No. 23-6067, 2024 WL 657980, at *5 (10th Cir. Feb. 16, 2024) (quoting *Fretwell v. Prot. Alarm Co.*, 764 P.2d 149, 151 (Okla. 1988)).

The district court held that OU did not breach the terms of the Handbook. In reaching this conclusion, it walked through each procedural step of non-renewal in the Handbook, explaining with citations to the Handbook how OU followed the process afforded to Tufaro. The district court explained that Tufaro was provided the requisite 180 days' notice of non-renewal, in contrast to termination, which could occur immediately with different notice and appeal procedures.

We agree with the district court that Tufaro was not "terminated" under the terms of the Handbook. And Tufaro's dogged, yet unsupported, insistence otherwise runs contrary to fundamental canons of Oklahoma contract law.

In interpreting the Handbook, our primary goal is to ascertain "the parties' mutual intentions from the four corners of the contract." *Walker v. Builddirect.Com Techs. Inc.*, 349 P.3d 549, 554 (Okla. 2015). We acknowledge that "the paramount objective of contract interpretation is to effectuate the intent of the parties as expressed by the terms of the contract." *Id.* at 552. We determine the parties' intent "from the entire agreement[,]" and "[i]f a contract is complete in itself and viewed in its entirety is unambiguous, its language is

16

the only legitimate evidence of what the parties intended." *Patel v. Tulsa Pain Consultants, Inc., P.C.*, 511 P.3d 1059, 1062 (Okla. 2022) (quoting *Whitehorse v. Johnson*, 156 P.3d 41, 47 (Okla. 2007)); *see also In re Estate of Metz*, 256 P.3d 45, 50–51 (Okla. 2011) (same). Here, Tufaro never argues the Handbook language is ambiguous, and we find the language plain and easy to interpret. As a result, we consider only the express language in the Handbook.

Tufaro insists that we must consider all the facts and circumstances surrounding the creation of his contract, including implied promises by OU officials that his contract would be renewed. But "a court may neither make a new contract to benefit a party nor rewrite the existing one." *Bonner v. Okla. Rock Corp.*, 863 P.2d 1176, 1183 (Okla. 1993) (emphasis removed). Tufaro could have bargained to have these implied promises included in his OU employment agreement, but he did not do so. In addition, the express language of the Handbook squarely addresses the disputed subject matter of non-renewal versus termination, and under Oklahoma law, "[a]n express contract excludes the possibility of an implied contract of a different or contradictory nature." *Jones v. Univ. of Cent. Okla.*, 910 P.2d 987, 990 (Okla. 1995); *see also Musket Corp. v. Star Fuel of Okla., LLC*, 606 F. App'x 439, 450 n.5 (10th Cir. 2015) (same).

Tufaro also faults the district court for not crediting the allegation in his pleading that OU "routinely renews similar appointments unless there is a just

17

basis for terminating the appointment." Aplt. Br. at 30 (quoting Aplt. App'x I at 46, Compl. ¶ 67). Even if true, however, Tufaro offers no authority that OU's routine renewal of other appointments bound OU to perpetually renew his. The Handbook afforded OU discretion to end Tufaro's employment, so long as it provided the requisite notice of 180 days.

Tufaro tries to blur the Handbook's dual tracks of termination and non-renewal, but a contract must be "construed as a whole, giving effect to each of its parts, and not construed so as to make a provision meaningless, superfluous or of no effect." *Patel*, 511 P.3d at 1062 (quoting *McGinnity v. Kirk*, 362 P.3d 186, 199 (Okla. 2015)); *see also Husky Ventures, Inc. v. B55 Invs., Ltd.*, 911 F.3d 1000, 1015 (10th Cir. 2018) (citing 15 Okla. Stat. § 157) (same). The Handbook draws repeated, clear contrasts between non-renewal and termination, including:

- **Notice.** The Handbook states that "termination" for certain categories requires more notice than is required for "non-renewal" while "termination" for other categories does not require *any* notice to the faculty member.

- **Timing**. Certain "improper acts" listed in § 3.16.1 "may result in immediate termination of employment." In contrast, for non-renewal, at least 90 days of notice is always required.

- **Appeal Rights**. The appeal rights for non-renewal are limited, while the appeal rights for termination are broader, especially if terminated for one of the improper conduct listed in § 3.16.1(a)-(d).

- **Headings.** The headings distinguish between non-renewal and termination. The heading in § 3.2.7 uses both terms, "Non-Renewal" and

18

"Termination." The heading in § 3.16(b) uses the term "Termination" but does not mention "Non-Renewal."

Aplt. App'x IV at 140–43.

Tufaro's interpretation of the Handbook would eliminate all these distinctions and render "non-renewal" superfluous. That, in turn, would collapse an essential purpose of the contract: to allow OU discretion to end Tufaro's employment without being required to proceed with – and later justify – a formal termination. The district court's plain reading of the Handbook upholds this distinction between termination and non-renewal and rightly "gives effect to both provisions[.]" *Husky Ventures*, 911 F.3d at 1018 (applying Oklahoma contract law).

Other courts have reached the same result we reach here, enforcing the distinction between non-renewal and termination in employment agreements. *See, e.g.*, *Sullivan v. etectRx, Inc.*, 67 F.4th 487, 492 (1st Cir. 2023) ("'[N]on-renewal' and 'termination' are distinct terms having different meanings[.]") (quoting *Mason v. Telefunken Semiconductors Am., LLC*, 797 F.3d 33, 42 (1st Cir. 2015)); *Mason*, 797 F.3d at 42 (observing that "the structure of the Agreement makes it nose-on-the-face plain that the contracting parties never intended to use those distinct terms synonymously"); *Paladyne Corp. v. Weindruch*, 867 So. 2d 630, 633 (Fla. Dist. Ct. App. 2004) ("There would be no

19

point in having a non-renewal provision if the effect of not renewing the contract is identical to the effect of terminating the contract[.]").

We affirm the district court's correct interpretation of the contract's terms.

**2**

The district court also dismissed Tufaro's state law claim under Article 2, § 22 of the Oklahoma Constitution because Tufaro failed to establish that a violation of § 22 creates a private right of action. The district court incorporated § 22 into the *Burk* tort claim, however, ruling that OU's alleged violation of Tufaro's freedom of speech could be used as the underlying public policy violation for a *Burk* tort.

We affirm the dismissal of the standalone § 22 claim. Section 22 states, in relevant part, that "[e]very person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." Art. 2 § 22, Okl. Const. This language, however, does not include a remedies provision or a standard of care, which points away from any private right of action. *See Matthews v. LaBarge, Inc.*, 407 F. App'x 277, 283 (10th Cir. 2011) (rejecting for these reasons the suggestion that an Oklahoma statute created a private right of action).

20

The Oklahoma courts have further advised that any tort claims against the state of Oklahoma (or its entities or employees) must proceed under the framework created by the Oklahoma Governmental Tort Claims Act, 51 Okla. Stat. Ann. § 162. *See Rowell v. Bd. of Cnty. Comm'rs*, 485 P.3d 879, 883 (Okla. Civ. App. 2020) (discussing Oklahoma Supreme Court pronouncements and recent legislative enactments further limiting the expansion of constitutional torts under Oklahoma law). Ultimately, Tufaro fails to even attempt to overcome the strong cautionary language against recognizing new private causes of action, regardless of sovereign immunity, based on separation of powers and other concerns. *See Barrios v. Haskell Cnty. Pub. Facilities Auth.*, 432 P.3d 233, 239–40 (Okla. 2018) (describing the role of the courts in recognizing new private rights of action for constitutional torts as a "disfavored judicial activity") (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017)).

**3**

We now turn to the § 1983 claims dismissed under Rule 12(b)(6). To proceed on a claim for money damages under § 1983,[4] a plaintiff must show

---

[4] Although Tufaro nominally sought prospective injunctive relief in the form of reinstatement of his job as an alternative form of relief, *see Frank v. Lee*, 84 F.4th 1119, 1131 (10th Cir. 2023) (explaining that "a state official in his or her official capacity, *when sued for injunctive relief*, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State'") (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989)), he failed to pursue this form of relief before the district court or as part of this appeal.

21

the deprivation of a federally protected right along with causation and damages. *See Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000). Tufaro challenges the district court's rulings on his claims that OU and the Individual Defendants violated his rights under the First and Fourteenth Amendments.

We first address the § 1983 claims against OU and the Individual Defendants in their official capacities and affirm the ruling that none of the defendants are a "person" under § 1983. It has long been settled that "[n]either states nor state officers sued in their official capacity are 'persons' subject to suit under section 1983" for monetary damages. *Duncan v. Gunter*, 15 F.3d 989, 991 (10th Cir. 1994). OU is a state university created by state law, and "[o]ur cases have consistently found state universities are arms of the state." *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 575 (10th Cir. 1996). Likewise, state officials sued in their official capacities are treated as extensions of the state rather than "persons" subject to § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Ruiz v. McDonnell*, 299 F.3d 1173, 1182 (10th Cir. 2002).

Tufaro contends that Defendants are properly treated as "persons" under § 1983 because they waived their sovereign immunity by removing his case to federal court. In response, OU explains that it did not raise sovereign immunity in the district court. Rather, the district court dismissed the § 1983 because — whether sovereign immunity applies or not — a state and state

22

actors are not "persons" who can be named as defendants for monetary damages. We agree. The Supreme Court has suggested that a state's sovereign immunity and the scope of § 1983 are "separate" issues. *Will*, 491 U.S. at 66. In line with *Will*, our case law has recognized that the definition of "person" under § 1983 is not dependent on sovereign immunity. *See Sutton v. Utah State Sch. for Deaf and Blind*, 173 F.3d 1226, 1237 (10th Cir. 1999) (dismissing official capacity claims even though state actors had waived sovereign immunity). Following our precedent, we affirm the district court's dismissal.

Tufaro also pursues claims against the Individual Defendants in their personal capacities for violations of § 1983. We first analyze the § 1983 deprivation of property claim. The Fourteenth Amendment prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1; *see also Teigen v. Renfrow*, 511 F.3d 1072, 1078–79 (10th Cir. 2007) (examining § 1983 claim for property deprivation). To state a plausible claim, a plaintiff must establish (1) "that it has a protected property interest" and (2) "that defendants' actions violated that interest." *Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1216 (10th Cir. 2003).

Tufaro relies on his subjective expectations that he was entitled to have his contract renewed. But under Oklahoma law, an untenured professor lacks a property interest in continued employment "absent a specific contractual

23

guarantee to that effect." *Bunger v. Univ. of Okla. Bd. of Regents*, 95 F.3d 987, 990 (10th Cir. 1996). As we have explained, "[a] property interest includes a 'legitimate claim of entitlement' to some benefit created and defined by 'existing rules or understandings that stem from an independent source such as state law.'" *Crown Point I, LLC*, 319 F.3d at 1216 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Thus, "it is only after the plaintiff first demonstrates the existence and deprivation of a protected property interest that the plaintiff is constitutionally entitled to an appropriate level of process." *Teigen*, 511 F.3d at 1078. Missing here was a specific contractual guarantee.

As we held, *supra*, OU followed the 180-day notice requirement set forth in the Handbook for non-renewal of his contract. Tufaro was not improperly terminated; his contract was not renewed. The Handbook states that a non-tenured professor is merely eligible for renewal of a contract. In this context, however, "eligible for" is not the same as "entitled to." This claim, therefore, fails because Tufaro has not properly alleged an underlying property interest.

Tufaro also asserts his liberty claim should have proceeded against the Individual Defendants in their personal capacities. A § 1983 claim for deprivation of liberty based on harm to a professional reputation requires that the statements at issue: (1) "impugn the good name, reputation, honor, or integrity of the employee"; (2) "be false"; (3) "occur in the course of terminating the employee" and "must foreclose other employment opportunities"; and (4)

24

"be published." *Renaud v. Wyo. Dep't of Fam. Servs.*, 203 F.3d 723, 727 (10th Cir. 2000) (quoting *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994)).[5]

Tufaro alleges he suffered injury to his reputation from false comments made by his successor, who told his then-current employer that his work at OU was "subpar" and that he was not permitted to interact with OU's medical residents after departing from OU. Opening Br. at 32. The district court held that the Complaint did not coherently state these alleged comments, including the speaker's name and the recipient of the alleged false statements. We share the district court's confusion in reading Tufaro's description of who said what, as set forth in his Complaint. And on appeal, Tufaro does not address the district court's ruling that the person who allegedly spoke to his then-current employer is neither identified by name nor named as a defendant in the case. These gaps, especially when taken together, are fatal.

Because vicarious liability does not apply to § 1983, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. As a result, a § 1983 plaintiff must show an "affirmative link" between each defendant and "'the constitutional violation,' which requires proof of three

---

[5] We restate here what we previously corrected from our case law about the third element, that it must be phrased *conjunctively*. *See McDonald v. Wise*, 769 F.3d 1202, 1212 n.3 (10th Cir. 2014).

25

interrelated elements: (1) personal involvement; (2) causation; and (3) state of mind." *Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016) (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013)).

Tufaro does not satisfy any of these elements. He says he was not required to notify each defendant of their alleged role, citing *Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008). Tufaro was correct to cite *Robbins*, but wrong to suggest it relieves him of adequate pleading obligations. In *Robbins*, in fact, we reversed the denial of a Rule 12(b)(6) motion and admonished that "complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants." *Id.* at 1249. There, as here, the plaintiff sued a list of government-actor defendants without providing notice of each defendant's alleged role in causing the alleged damages. For the same reasons we affirmed the Rule 12(b)(6) dismissals in *Robbins*, we also affirm here.

Ultimately, "[w]hile we do not mandate the pleading of any specific facts in particular, there are certain details the Plaintiff should know and could properly plead to satisfy the plausibility requirement." *Khalik v. United Air Lines*, 671 F.3d 1188, 1194 (10th Cir. 2012). In this case, Tufaro failed to provide notice to each defendant of their alleged role in violating his liberty

26

interest, and he failed to identify the speaker or the recipient of the allegedly false comments, so the claim was properly dismissed.

Although the district court dismissed this claim, Tufaro was granted leave to amend so he could cure these pleading defects. He declined to do so and omitted the § 1983 liberty claim from the First Amended Complaint. Citing *Davis v. TXO Prod. Corp.*, 929 F.2d 1515, 1517 (10th Cir. 1991), Tufaro argues that a plaintiff is permitted to appeal a claim dismissed on a Rule 12(b)(6) ruling, even if the plaintiff is given leave to amend and then refiles an amended complaint that does not include the claim. That is inaccurate. In fact, "[a]n amended complaint supersedes a prior complaint 'and renders it of no legal effect.'" *Mooring Cap. Fund, LLC v. Knight*, 388 F. App'x 814, 823 (10th Cir. 2010) (quoting *Davis*, 929 F.2d at 1517). Failing to replead a claim, when given leave to do so, ordinarily constitutes abandonment when an amended complaint is filed. *See id.* at 823–24 (citing *Davis*, 929 F.2d at 1517–18). Thus, by failing to replead it in the First Amended Complaint, Tufaro abandoned the § 1983 liberty claim.

## B

We next review the summary judgment rulings against Tufaro on the two claims alleged in the First Amended Complaint: the § 1983 First Amendment retaliation claim against Dr. Edil and Dr. Zubialde and the *Burk* tort claim against OU.

27

**1**

The § 1983 First Amendment claim against Zubialde and Edil in their personal capacities stalled at summary judgment. The district court held that the speech at issue (i.e., the complaints Tufaro made to OU officials) was not protected because it was made as part of Tufaro's official duties as Chief of Plastic Surgery and Professor at OU's Medical College.

As a public employee, Tufaro "enjoyed First Amendment rights, but not to the same extent as a private citizen." *Seifert v. Unified Gov't of Wyandotte Cnty.*, 779 F.3d 1141, 1151 (10th Cir. 2015). "[T]he First Amendment protection of a public employee's speech depends on a careful balance 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Lane v. Franks,* 573 U.S. 228, 231 (2014) (quoting *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968)).

To accommodate this balancing, we apply the *Garcetti/Pickering* test that "governs First Amendment retaliation claims." *Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1367 (10th Cir. 2015) (quoting *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014)); *see Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering*, 391 U.S. 563. This test includes the following five factors:

1. whether the speech was made pursuant to an employee's official duties;

2. whether the speech was on a matter of public concern;

3. whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests;

4. whether the protected speech was a motivating factor in the adverse employment action; and

5. whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Helget v. City of Hays*, 844 F.3d 1216, 1221 (10th Cir. 2017) (cleaned up).

The first three factors "are ordinarily matters of law for a court to decide, and the final two steps are ordinarily questions of fact." *Singh v. Cordle*, 936 F.3d 1022, 1034 (10th Cir. 2019). And although we call these factors, they are also essential elements: "[t]o prevail, a plaintiff must establish all five elements." *Knopf v. Williams*, 884 F.3d 939, 945 (10th Cir. 2018).

Under the first factor ("official duties"), the district court concluded that the six topics raised by Tufaro were made within the scope of his official duties at OU. In repeated cases, we have "taken a broad view of the meaning of speech that is pursuant to an employee's official duties." *Chavez-Rodriguez v. City of Sante Fe*, 596 F.3d 708, 713 (10th Cir. 2010) (quoting *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008)). This creates a "heavy barrier" to overcome. *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741,

746 (10th Cir. 2010) (quoting *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1331 (10th Cir. 2007)).

In applying the first factor, we take "a case-by-case approach, looking both to the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties." *Id*. Our focus is on "the *context* of the speech[.]" *Singh*, 936 F.3d at 1035. In looking at context, "[m]any facts may be relevant—the tasks in an employee's job description, the frequency with which an employee performs a task, the subject matter of the employee's speech, the recipient of the employee's speech, the legal obligation for the employee to speak—but no one fact is determinative." *Knopf*, 884 F.3d at 945.

Tufaro argues that of all the complaints he raised, topic six, the refusal of the affiliated oral surgeons to treat patients without insurance, especially involved patient safety that landed outside of his official duties. "It is not enough, however, that the public interest was part of the employee's motivation. In several cases we have described the relevant legal question as whether the employee's *primary* purpose was to raise a matter of public concern." *Singh*, 936 at 1035.

In *Singh*, a government worker complained about internal work issues that also affected the public. We held that "if we find that the employee's personal interest" as an "employee predominates over any interest he might

30

have as a member of the general public, we are not to intercede." *Singh*, 936

F.3d at 1035 (citation omitted).

Here, Tufaro's critical comments on topic six were directed at internal

scheduling and patient access issues he faced within his scope of employment.

Tufaro was complaining about the refusal of the oral surgeons to treat

uninsured patients, which is a serious allegation to be investigated. But Tufaro

raised these issues at this specific time because the gap in coverage was falling

on him; he personally was forced to treat these otherwise-neglected patients.

He focused on the internal effect the oral surgeons' alleged refusals to treat

certain patients had on his schedule while fulfilling his high-ranking duties as

Professor and Chief of Plastic and Reconstructive Surgery at OU. He said:

- "[T]his is the third time this has happened to me[.]" Aplt. App'x II at
  17.

- "Here is a patient with a complicated injury coming to the state
  hospital for care and rejected because he doesn't have enough cash. I
  am seeing him in clinic tomorrow." Aplt. App'x V at 96.

- "[I]t impacted my life because I was now seeing patients that they
  initially saw and rejected treatment, rejected care." *Id.* at 97.

As these comments clarify, even viewed in the light most favorable to

him, Tufaro was "engaging in speech that 'contribute[d] to or facilitate[d]'" his

performance of job functions. *Chavez-Rodriguez*, 596 F.3d at 714 (quoting

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir.

2007)). Although not every complaint was raised by email, all of Tufaro's email

31

criticisms were sent from his official OU email account to other OU email accounts. And Tufaro's comments never reached beyond the OU campus.

These issues confronted Tufaro only because of his official position. As we have observed, "'even if not explicitly required as part of [their] day-to-day job responsibilities,' an employee's statements are made pursuant to official duties when they 'stemmed from and were the type of activities that [they were] paid to do.'" *Id.* at 716 (quoting *Green v. Bd. of Cnty. Comm'rs*, 472 F.3d 794, 800–01 (10th Cir. 2007)). In this case, as Professor and Chief of Plastic and Reconstructive Surgery, Tufaro's complaints fell within the range of his job duties, which included administrative, supervisory, and clinical roles. *See Rohrbough*, 596 F.3d at 747–49 (concluding that complaints about "substandard" hospital care for patients fell within the plaintiff's zone of job duties even if not expressly part of day-to-day job duties, especially because complaints stayed within chain of command).

The first factor (the "official duties" factor) was added to the balancing test by the Supreme Court's decision in *Garcetti*, which held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. In *Garcetti*, a deputy district attorney acting as a supervisor wrote a memo that "demanded the attention of his supervisors and

32

led to a heated meeting with employees from the sheriff's department." *Id.* at 423. Critical to the "official duties" holding was the "contrast" between the facts in that case and "the expressions made by the speaker in *Pickering*, whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day." *Id.* at 422.

The same logic applies here. When Tufaro complained about the six topics at issue, he was acting as an OU official with multiple duties and supervisory responsibilities. *See, e.g.*, *Knopf*, 884 F.3d at 949 (emphasizing the distinction between "a rank-and-file detective without supervisory responsibilities" and an official "tasked [] with a broad oversight role" when determining whether an employee was acting pursuant to their "official duties").

In *Garcetti*, the Supreme Court also emphasized the public policy reasons that dictate deference from the courts to the day-to-day decision-making of state officials. 547 U.S. at 422–23 ("Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission.").

It also provided reassurance that other protections are in place to ensure that public employees continue to speak out against "governmental inefficiency and misconduct[,]" including a "powerful network of legislative enactments –

33

such as whistle-blower protection laws and labor codes – available to those who seek to expose wrongdoing." *Id.* at 425. These legislative protections, "as well as obligations arising from any other applicable constitutional provisions and mandates of the criminal and civil laws, protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions." *Id.* at 425–26. Thus, we do not suggest that Tufaro's criticisms were unfounded or that OU should have ignored them. But at the same time, he could have pursued other avenues, including a letter to the editor of a newspaper or a complaint under the Oklahoma Whistleblower Act, which was in effect in 2019 at the time of Tufaro's complaints.[6]

In sum, we affirm the district court's entry of summary judgment for the Individual Defendants (Edil and Zubialde) on the First Amendment retaliation claim under § 1983.

**2**

The district court also entered summary judgment on the final remaining claim at issue, the *Burk* tort claim. The protection of a *Burk* tort

---

[6] "The Oklahoma Whistleblower Act's purpose is to encourage and protect the reporting of wrongful governmental activities and to deter retaliation against state employees for reporting those activities[,]" and "a *Burk* tort claim is not cognizable for claims that would be covered by the Whistleblower Act." *Poff v. Okla. ex rel. Okla. Dep't of Mental Health and Substance Abuse Servs.*, 683 F. App'x 691, 695 (10th Cir. 2017) (quoting *Shephard v. CompSource Oklahoma*, 209 P.3d 288, 290–91 (Okla. 2008)).

operates as a counterbalance to Oklahoma's default "employment-at-will doctrine." *Booth v. Home Depot, U.S.A., Inc.*, 504 P.3d 1153, 1156 (Okla. 2022). Without limitation or liability, the at-will doctrine permits an employer to "discharge an employee for good cause, no cause, or even for a morally wrong cause[.]" *Id.* (quoting *Reynolds v. Advance Alarms, Inc.*, 232 P.3d 907, 909 (Okla. 2009)).

Yet a narrow exception to this rule exists in Oklahoma. In *Burk*, 770 P.2d at 29, the Oklahoma Supreme Court held that "at-will contractual rights may be limited by the public policy of the State of Oklahoma." *Booth*, 504 P.3d at 1156. *Burk* recognized a private right of action tort claim for an at-will employee discharged "for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy." 770 P.2d at 29. To pursue a *Burk* tort claim, a plaintiff must establish:

1.  an actual or constructive discharge[;]

2.  of an at-will employee[;]

3.  in significant part for a reason that violates an Oklahoma public policy goal[;]

4.  that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma[;] and

5.  no statutory remedy exists that is adequate to protect the Oklahoma policy goal.

*Booth*, 504 P.3d at 1156. We also note the directive that *Burk* "applies to only a narrow class of cases and must be tightly circumscribed." *McCrady v. Okla. Dep't of Pub. Safety*, 122 P.3d 473, 475 (Okla. 2005).

The facts of Tufaro's case fall outside the orbit of *Burk*. Even with the benefit of discovery, Tufaro did not establish that he was an "at-will" employee. Protected by the Handbook's rights and procedures and, in fact, afforded 180 days of notice prior to his departure from OU, his employment could not be terminated at any point for any reason, as Oklahoma has defined at-will employee status. *Ho v. Tulsa Spine & Specialty Hosp., L.L.C.*, 507 P.3d 673, 677 (Okla. 2021) (observing that "indefinite employment contracts are deemed terminable-at-will a/k/a employment-at-will").

Failure to satisfy this element defeats this claim. Because Tufaro was "not an employee-at-will, he is not within the class of persons who may bring a claim in tort for wrongful discharge based on the public policy exception" created by *Burk*. *McCrady*, 122 P.3d at 476.

**3**

As a final matter, Tufaro argues for the first time on appeal, and only in passing in his Opening Brief (without any retort to OU's arguments in his Reply Brief), that the district court erred by not remanding the *Burk* tort claim back to the state court. Opening Br. at 46. His passing mention of error for

36

failing to remand was an alternative argument in a section of his Brief wherein he primarily argued the district court committed error by granting summary judgment on the *Burk* tort claim because a question of fact existed. *Id.* at 44-46.

Congress enacted 28 U.S.C. § 1367 to combine "the doctrines of pendent and ancillary jurisdiction under a common heading[,]" now referred to as "supplemental jurisdiction." *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 165 (1997). Under § 1367, a district court may decline to exercise supplemental jurisdiction over a state law claim if, among other reasons, it has "dismissed all claims over which it has original jurisdiction." *Id.* at § 1367(c)(3). In making this determination, the district court must consider the "nature and extent of pretrial proceedings, judicial economy, convenience, and fairness." *Foxfield Villa Assocs., LLC v. Robben*, 967 F.3d 1082, 1102-03 (10th Cir. 2020). And although it often makes sense on comity and federalism grounds to remand state law claims if all the federal claims have been dismissed, "we have [also] suggested that it is appropriate, perhaps even advisable, for a district court to retain supplemented state claims after dismissing all federal questions when the parties have already expended a great deal of time and energy on the state law claims." *Id.* at 1103 (alteration in original) (quoting *United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002)).

We review a district court's decision to retain supplemental jurisdiction over state law claims for abuse of discretion. *Id.* at 1102–03. "The deferential abuse of discretion standard enhances the goal of judicial economy and serves to maintain the integrity of the trial and appellate courts." *Hughes v. City of Fort Collins*, 926 F.2d 986, 988 (10th Cir. 1991). Thus, "[t]he watchword of our abuse of discretion review is *deference.*" *In re Sygenta AG MIR 162 Corn Litigation*, 61 F.4th 1126, 1177 (10th Cir. 2023) (emphasis in original).

We find no abuse of discretion here. As OU correctly points out, Tufaro waived the remand argument by never presenting it below. *See Rocky Mountain Wild, Inc. v. United States Forest Serv.*, 56 F.4th 913, 927 (10th Cir. 2022) (explaining that a plaintiff waives an argument by failing to present it to the district court). By not raising it below, Tufaro never put the § 1367 factors in play for the district court to analyze and explain in its decision.

The dissent is concerned that we will be haunted in future cases by our holding. However, this concern fails to credit that the decision to exercise supplemental jurisdiction is "purely discretionary[,]" *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639-40 (2009), and "not a jurisdictional matter." *Id.*; § 1367(c) ("The district courts *may* decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction.") (emphasis added). Our review is for abuse of discretion because the decision to exercise supplemental jurisdiction

38

"may not be raised at any time as a jurisdictional defect." *Id.* In this context, the distinction between a discretionary decision and a jurisdictional requirement is dispositive.

The dissent also finds fault that we do not cite any opinion of this circuit holding that remand to state court of state-law claims is dependent on the plaintiff's moving for a remand or dismissal in district court. Our holding here is of a different sort – that we cannot find an abuse of discretion when a plaintiff never requests a remand to state court before the district court but instead complains about it for the first time on appeal. The application of waiver preserves the integrity of appellate review. *Cummings v. Norton*, 393 F.3d 1186, 1190 (10th Cir. 2005) ("[T]o preserve the integrity of the appellate structure," we apply the waiver doctrine to avoid reviewing new arguments "not presented to the district court – especially when an appeal is of a summary judgment[.]") (cleaned up).

Tufaro "never gave the district court an opportunity to exercise its discretion[.]" *United States v. Morgan*, 748 F.3d 1024, 1044 (10th Cir. 2014) (Holmes, J., concurring); *see id.* (cautioning that a reversal based on arguments never raised below would improperly "suggest that district courts should act as advocates" bound to construct arguments on behalf of litigants). Indeed, "[a] trial court cannot be expected to read litigants' minds." *Nulf v. Int'l Paper Co.*, 656 F.2d 553, 563 (10th Cir. 1981). "We would be opening Pandora's box" if we

39

agreed with the dissent and reversed the district court, because "[a]ny litigant would then be free to claim after-the-fact that she had intended to" seek remand without ever requesting that relief. *Id.*

Additionally, the dissent suggests the district court was required to sua sponte identify a remand argument on Tufaro's behalf and then exercise its discretion to remand the state law claim after weighing the factors in Tufaro's favor. But the district court is "under no obligation to raise the possibility of dismissal under § 1367(c) sua sponte." 13D C. Wright, A. Miller, and R. Freer, Federal Practice and Procedure Jurisdiction § 3567.3 (3d ed.). Seven of our sister Circuits have held that a remand request is waived if not argued by the plaintiff and that a district court owes no duty to sua sponte review and explain the § 1367(c) factors. *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 20 (1st Cir. 2018); *Sarpolis v. Tereshko*, 625 F. App'x 594, 600 (3d Cir. 2016)*; Powers v. United States*, 783 F.3d 570, 576–77 (5th Cir. 2015) (same); *Alternate Fuels, Inc. v. Cabanas*, 435 F.3d 855, 857 n.2 (8th Cir. 2006); *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 522 (7th Cir. 2003); *New Jersey Turnpike Auth. v. PPG Indus.*, 197 F.3d 96, 113 (3d Cir. 1999); *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1000–01 (9th Cir. 1997) (en banc); *Doe v. District of Columbia*, 93 F.3d 861, 871 (D.C. Cir. 1996). The dissent's position would put this court on an island of a circuit split, a place and position where we decline to take up residence.

40

In addition, as OU argues, the parties can be fairly said to "have already expended a great deal of time and energy on the state law claims." *Foxfield Villa Assocs., LLC*, 967 F.3d at 1103. The dissent disagrees with this finding and concludes that very little effort was expended on the *Burk* tort claim in district court. We have a different view.

There were two years of heavy activity in federal court post-removal, and the docket sheet in the district court shows that Tufaro engaged in wide-ranging discovery and briefing and that the district court devoted significant time and resources to preparing the case for trial. As OU recounts:

> [Tufaro] participated in over two years of litigation—from the date of removal to his notice of appeal—by opposing motions to dismiss, amending his complaint, attending a scheduling conference, filing a joint status report and discovery plan, exchanging initial disclosures and written discovery, taking and presenting witnesses for depositions, filing a motion to compel certain discovery and deposition testimony, submitting an expert report, and engaging in extensive motion practice leading up to the discovery deadline including the motion for summary judgment he lost and now appeals. Instead of asking the District Court to remand his *Burk* tort claim to state court, Tufaro opposed summary judgment by arguing on the merits that his employment contract did not have a definite term [App. Vol. 5 at 1145], an argument considered and rejected by the District Court [App. Vol. 5 at 1202-1203].

Response Br. at 44-45; *see also* Apl't Appx. Vol. I at 14-25 (docket sheet showing the district court's multiple scheduling orders and the parties' extensive pretrial activity and wide-ranging discovery, and Tufaro's numerous filings and requests for relief in the district court).

41

After he filed the First Amended Complaint, the case proceeded to discovery in federal court. When Defendants moved for summary judgment, Tufaro responded on the merits and fully briefed this claim at summary judgment without ever requesting remand of the *Burk* claim to state court. The *Burk* tort claim was dismissed at the same time as the remaining § 1983 First Amendment claim, not afterward. In other words, the district court did not retain jurisdiction over only the state law claim; rather, it dismissed the § 1983 federal claim and the *Burk* tort claim simultaneously at summary judgment.

Also significant is that Tufaro's First Amended Complaint specifically invoked the federal court's jurisdiction to seek federal *and* state law relief. Aplt. App'x I at 37, First Am. Compl. ¶¶ 11–13. Doing just as Tufaro asked in his First Amended Complaint, the district court exercised its authority to resolve the two claims that Tufaro chose to allege in his First Amended Complaint filed in federal court. When a plaintiff files an amended pleading in federal court, this move is legally significant. *See Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1036 (10th Cir. 1998) (holding that a plaintiff "cannot voluntarily invoke, and then disavow, federal jurisdiction"). We long ago recognized that a "plaintiff acquiesces" in removal by "seeking relief" in federal court and not challenging removal until after an adverse judgment is entered. *Parks v. Montgomery Ward & Co.*, 198 F.2d 772, 774 (10th Cir. 1952); *see also Lopata v. Handler*, 121 F.2d 938, 940 (10th Cir. 1941) (recognizing that a

42

plaintiff waives the right to remand by pursing relief in federal court and raising error for failure to remand the case only after losing in federal court).

We therefore agree with OU that reversing the district court and remanding the *Burk* tort claim would be fundamentally unfair. Tufaro made the strategic decision to seek a win in federal court on the merits at summary judgment and, if he had defeated that motion, he would have sought to pursue the *Burk* tort claim at trial in federal court. Allowing him to request remand for the first time on appeal, and only in passing, would improperly reward his failure to raise this remand argument below and incentivize future plaintiffs to adopt this same wait-and-see approach. Reversing the district court would allow Tufaro (and future plaintiffs) to litigate the same claim twice: once in federal court and then, if unsuccessful, again in state court. *See Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650, 657 (2d Cir. 1996) (making this point); *New Mexico v. Gen. Elec. Co.*, 335 F. Supp. 2d 1157, 1179 (D.N.M. 2003) (explaining the unfairness of allowing a plaintiff to file an amended pleading in federal court, lose on the merits at summary judgment, and only then seek remand) (citing *Akin*, 156 F.3d at 1036).

We conclude there was no abuse of discretion here by the district court in retaining federal jurisdiction over the state law claim and disposing of it on the merits.

**V**

The judgment of the district court is AFFIRMED.

23-6039, *Tufaro v. Board of Regents*

**HARTZ**, J., dissenting in part

I join all the panel opinion except the discussion rejecting remand to the state court of Tufaro's state-law *Burk* claim, which came to the federal court under the doctrine of what is now termed supplemental jurisdiction in 28 U.S.C. § 1367.

The leading Supreme Court opinion on that doctrine (which the Court then referred to as pendent jurisdiction) is *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966). *See* Wright & Miller, Federal Practice and Procedure § 3523.1, at 195 (§ 1367(a) and (c) codify *Gibbs*). Such jurisdiction arises when the "state and federal claims . . . derive from a common nucleus of operative fact. . . . [I]f, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole." *Gibbs*, 383 U.S. at 725.

Relevant here, however, is that this "power need not be exercised in every case in which it is found to exist." *Id.* at 726. In particular, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Id.* Addressing the specific situation that arises in this case, the Court declared, "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.*

This "should be dismissed" statement in *Gibbs* was later qualified, but as a practical matter not by much. Footnote 7 in *Carnegie-Mellon Univ. v. & Cohill*, 484 U.S. 343, 350 n.7 (1988), said that the Court after *Gibbs* had made "clear that this statement does not establish a mandatory rule to be applied inflexibly in all cases." *Cohill* also made clear, however, that retaining jurisdiction over the state-law claims would be exceptional. The text of the opinion to which footnote 7 was appended stated:

> Under *Gibbs,* a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, *as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain,[7] the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.*

*Id.* at 350 (emphasis added). Although there is some tension between the text and the footnote in *Cohill*, the footnote tries to explain as follows: "The statement simply recognizes that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n.7.

One should thus treat the seemingly mandatory language in *Gibbs* and *Cohill* as creating a presumption, which can be overcome in persuasive circumstances. *See* 15A Moore's Federal Practice - Civil § 106.66[1] ("There is no presumption in favor of dismissal *unless* all of the federal claims are dismissed

2

before trial." (emphasis added)); 13D Wright & Miller § 3567.3, at 429 (referring to the "presumption" that supplemental jurisdiction should be declined if the claims underlying federal jurisdiction are dismissed before trial). As a result, this court has regularly, and almost uniformly, ordered or affirmed dismissal or remand of the state-law claims in that circumstance when we have addressed the matter. For example, in the two opinions by this court cited by the majority opinion on this issue, we affirmed the district court's declination of supplemental jurisdiction after dismissal of the sole federal-law claim in *Foxfield Villa Assoc., LLC v. Robben*, 967 F.3d 1082 at 1102–03 (10th Cir. 2020), and we reversed for abuse of discretion the district court's retention of supplemental jurisdiction after dismissal of the federal claims, *United States v. Botefuhr*, 309 F.3d 1263, 1273–74 (10th Cir. 2002); *see also, infra* p. 17 (listing cases where this court ordered dismissal or remand although issue was not raised in district court).

One would think that this law would resolve what we should do with the state-law *Burk* claim. All the federal-law claims were dismissed on pretrial motions. The only state-law claim Tufaro wishes to pursue should therefore be remanded to state court absent exceptional circumstances. No such circumstances are present.

Yet the majority opinion says there is no abuse of discretion in failing to remand. To be sure, supplemental jurisdiction is not mandatory, leaving its exercise to the discretion of the court. But the abuse-of-discretion standard does not mean "anything goes." It is worth repeating that "[w]hen the balance of

3

[several pertinent] factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court *should* decline the exercise of jurisdiction by dismissing the case without prejudice." *Cohill,* 484 U.S. at 350 (emphasis added). When the Supreme Court says what a lower court "should" do, I would infer that a failure to do that is an abuse of discretion, absent exceptional circumstances. Put another way, given the presumption in favor of remanding state-law claims when all the federal claims are dismissed before trial, it is an abuse of discretion to act otherwise absent exceptional circumstances. Nothing in the cases cited by the majority opinion for the proposition that our review is for abuse of discretion in any way questions or detracts from the Supreme Court opinions instructing how courts should proceed in the present circumstances.

One possible exceptional circumstance would be that the state-law claim is frivolous. *See* 14D Wright & Miller § 3567.3, at 436–47 ("[T]he federal court may also exercise supplemental jurisdiction when the resolution of the supplemental claims on the merits is obvious."). But that is not the ground on which the majority opinion relies. And, in my view, Tufaro's *Burk* claim is not frivolous. *Burk* permits an at-will employee to sue an employer for terminating the employee on grounds contrary to public policy. Tufaro contends that he is entitled to bring a claim under the *Burk* doctrine on the ground that he was denied a renewal of his contract for reasons contrary to public policy. Tufaro's contract was to be automatically renewed each year but the University could decide not to renew for

4

any reason so long as proper notice was given. The district court rejected his claim on the ground that *Burk* applies only to at-will employees and Tufaro had an employment contract. I suspect that I would have ruled the same way were I a judge in federal district court. But I do not think it is out of the question that the Oklahoma courts would expand *Burk* beyond the discharge of at-will employees to include the failure to renew a contract like Tufaro's for reasons contrary to public policy. As a matter of comity to the Oklahoma courts, it is appropriate to remand to state court to get the State's ruling on the issue. To repeat another earlier quotation, "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726.

What are the exceptional reasons relied on by the majority opinion to justify the failure to remand? One is that the parties "have already expended a great deal of time and energy on the state law claims." Maj. Op at 41 (internal quotation marks omitted). This reason, however, must be examined closely. After all, one would think that ordinarily by the time the district court has disposed of all the federal-law claims, the parties have explored at some depth the various state-law claims. If typical exploration sufficed to preclude remand, the presumption of remand would be meaningless. The "judicial economy" and "convenience" concerns should instead focus on whether the time and effort devoted to the state-law issue in federal court would need to be duplicated if the claim is sent to state court. The less the duplication of effort resulting from remand, the less any

5

considerations of efficiency argue against remand. *See* 15A Moore's Federal Practice - Civil § 106.66 ("In making the determination concerning the extent of resources that had been invested, the court should consider whether those resources may be used in the state forum."). For example, even if there had been extensive, time-consuming discovery regarding the state-law claims, that discovery could be as useful in state court as in federal court. *See id.* ("discovery . . . may be largely reusable in state court"); 14D Wright & Miller § 3567.3, at 435 ("if the parties may use discovery from the federal case in state court proceedings . . . the federal court might decline jurisdiction"). And usually "investigation of facts and research of state law is the same whether the case remains in federal court or is dismissed in favor of a state forum." 15A Moore's Federal Practice - Civil § 106.66.

In addition, one should not focus on all the claims presented in federal court, but only those that are to be sent to state court. Time devoted in federal court to the federal claims is irrelevant. As stated by a leading treatise, "Another factor to consider is whether the substantial pretrial activity (and the district court's involvement in that activity) relates to the dismissed federal claims." *Id.*; s*ee* 14D Wright & Miller § 3567.3, at 434 (relevant consideration is investment of resources "in the supplemental claims"). This proposition also applies, of course, to state-law claims that are being abandoned by the plaintiff.

Here, the only state-law claim that Tufaro wishes to pursue in state court is the *Burk* claim. How much effort was expended on that claim in district court?

6

Very little. The only relevant "discovery" was to determine the language of the employment contract. And the legal arguments on the claim in district court consumed a little more than one page of Tufaro's briefs and a little more than two pages of defendants'. If that is the standard for expending a great deal of time and energy, then the Supreme Court was wasting its breath in *Gibbs* and *Cohill*.

I am puzzled by the majority opinion's reliance on the fact that "Tufaro engaged in wide-ranging discovery and briefing and . . . the district court devoted significant time and resources to preparing the case for trial." Maj. Op. at 41. What is the relevance of this activity if it had nothing to do with the *Burk* claim? I see none. What I do see is an argument that would eviscerate the presumption in favor of remand whenever the federal claims are substantially disputed. Quite simply, the majority opinion has pointed to no significant work by the parties that would need to be duplicated on remand to state court, and the time spent by the federal district court in resolving the *Burk* claim was trivial as these matters go.

An even less persuasive argument against remand is the following statement in the majority opinion: "Also significant is that Tufaro's First Amended Complaint specifically invoked the federal court's jurisdiction to seek federal *and* state law relief. Aplt. App'x. I at 37, First Am. Compl. ¶¶ 11–13." Maj. Op. at 42. The original complaint was filed in state court, and the First Amended Complaint was filed in federal court after removal by the defendants. The three cited paragraphs are in the First Amended Complaint under the heading "Jurisdiction and Venue." The heading and paragraphs 11 and 12 are identical to the heading

7

and the same paragraphs in the original complaint. Paragraph 11 states that some claims are brought under 42 U.S.C. § 1983. Paragraph 12 states that other claims arise under Oklahoma law. Paragraph 13 in the state complaint states that the court had subject-matter jurisdiction over the claims. Paragraph 13 in the federal complaint merely states the undeniable fact that the federal court had jurisdiction over all Tufaro's claims under "28 U.S.C. §§ 1331, 1367 and 42 U.S.C. § 1983." The only substantive change in the amended complaint filed in federal court was the addition of a state-law claim, which would have no effect on the basis of federal jurisdiction in the case. I fail to see how submission to the obvious and inevitable fact that the federal court had jurisdiction over the case constitutes "invoking" jurisdiction or has anything to do with whether the state-law claims should now be remanded to state court. Clearly Tufaro preferred the state venue to federal court; that is why he filed his claims there. But once the defendants removed the case to federal court, he had no choice but to proceed in that venue. He never "invoked" federal-court jurisdiction; he was stuck with it. Is it really an exceptional circumstance for the plaintiff in a removed case to amend the complaint and, in doing so, comply with the requirement of Federal Rule of Civil Procedure 8(a)(1) by stating the ground of federal jurisdiction? I suspect such action is quite common.

The majority opinion tries to support its puzzling analysis by stating: "When a plaintiff files an amended pleading in federal court, this move is legally significant. *See Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1036 (10th Cir.

8

1998) (holding that a plaintiff 'cannot voluntarily invoke, and then disavow, federal jurisdiction')." Maj. Op. at 42. But *Akin* says not a word about jurisdiction under § 1367. The issue in *Akin* was whether the plaintiff in that case had waived the right to challenge on appeal the propriety of the removal of the case from state court to federal court when, after removal, the plaintiff amended the complaint to add additional federal-law claims. Here, there is no challenge to the propriety of the removal and plaintiff did not add any federal-law claims. It is no surprise that the majority opinion does not cite any case, nor am I aware of any, that applies the *Akin* reasoning in the context of a remand or dismissal under § 1367.

The other cases (from 1941 and 1952) cited on this point by the majority opinion similarly consider whether there was waiver of any objection to the original removal by failing to object until after entry of an adverse judgment. (Since 1988, 28 U.S.C. § 1447(c) has required any nonjurisdictional objection to removal to be filed within 30 days after filing of the notice of removal.) In sum, I fail to see how Tufaro's filing of an amended complaint amounted to some sort of tactical or strategic maneuver that should change the calculus in assessing the application of § 1367(c). Rather, he was merely doing what the defendants made him do—pursuing his litigation in the defendants' chosen forum.

The majority opinion's remaining ground for denying remand is that Tufaro waived (forfeited?[1]) the issue by not raising it in district court. I question the

_____

[1] Although the majority opinion and the cases it cites speak in terms of waiver of the remand issue, this circuit has numerous opinions stating that the failure to raise an

9

premise of this ground. The majority opinion does not explain when and how

Tufaro should have raised the issue. The issue did not arise until the district court

dismissed all the federal claims. And that dismissal was in the court's final

judgment. Tufaro could have filed a postjudgment motion for reconsideration, but

we ordinarily do not require a party to file a motion for reconsideration to correct

error at that stage of the proceeding instead of just appealing the error. *See United

States v. Madrid*, 633 F.3d 1222, 1228 (10th Cir. 2011) (Kelly, J., concurring) ("In

the civil context, there is absolutely no authority that creates an obligation to raise

a motion to reconsider in order to preserve an argument for appeal." (brackets and

internal quotation marks omitted)).

In any event, the majority opinion ignores that the decision to remand is

predicated in large part on fundamental issues of federalism not under the control

of the parties. As the Supreme Court stated in *Gibbs*, "Needless decisions of state

law should be avoided both as a matter of *comity* and to promote justice between

the parties." 383 U.S. at 726 (emphasis added). When the Supreme Court speaks

of comity, it is referring to the respect that federal courts should show to state

judicial processes. Since the issue to be resolved is a matter of state law, we

should let the state courts handle it. In my view, Tufaro raises a substantial

---

issue in the district court is generally termed a forfeiture rather than a waiver. A forfeited issue can be raised on appeal and is reviewed for plain error. *See, e.g., Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1127–28 (10th Cir. 2011). An issue not pursued in district court is considered waived only if it was intentionally relinquished or abandoned. *See id.* at 1127.

10

question of state law when he suggests that he was in effect an at-will employee if the University could refuse without cause to renew his contract. A federal court might be most reluctant to extend state law in that direction, but the state courts may think it appropriate. Tufaro should have the opportunity to make that argument in state court.  Even when the parties may have no particular interest in comity, the federal courts do. As a result, waiver doctrine has a very limited role in this sphere. It is worth noting that this limitation on waiver is not unique to the comity context. "[W]hen a rule implicates judicial interests beyond those of the parties, it may be appropriate for a court to invoke the rule *sua sponte* in order to protect those interests." *United States v. Mitchell*, 518 F.3d 740, 750 (10th Cir. 2008) (court of appeals may *sua sponte* raise time bar for filing notice of appeal).

A good example of where comity overrides what would otherwise be a waiver (or forfeiture) is *Granberry v. Greer*, 481 U.S. 131 (1987). In that case the Supreme Court considered whether an appellate court can and should dismiss a habeas claim challenging a state conviction under 28 U.S.C. § 2254 for failure of the prisoner to exhaust state remedies when the State had not raised nonexhaustion in the district court. The Court began by noting that "as a matter of comity, federal courts should not consider a claim in a habeas corpus petition until after the state courts have had an opportunity to act." *Id.* at 133 (internal quotation marks omitted). Hence, the State's failure to raise exhaustion "makes it appropriate for the court of appeals to take a fresh look at the issue. The court should determine whether the interests of comity and federalism will be better served by addressing

11

the merits forthwith or by requiring a series of additional state and district court proceedings before reviewing the merits of the petitioner's claim." *Id.* at 134. The Court then briefly described some of the relevant considerations, such as whether the prisoner's claim clearly lacks merit or whether the federal district court had conducted a full trial on the merits. *See id.* at 134–36. The analysis to be conducted by the court of appeals appears to be essentially the same as the Supreme Court in *Gibbs* described in determining whether to remand the state-law claims that were before the federal district court only under supplemental jurisdiction. In particular, failure to preserve the issue in district court is largely irrelevant.

A close analogue to the context before us is the practice of certifying a state-law issue to a state's highest court. Such certification is a fairly modern practice primarily designed to replace an earlier practice of the Supreme Court designed to respect (that is, show comity to) state-court interpretation of state law. In the old days, the Supreme Court created *Pullman* abstention, *see Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941), in which a federal district court was to abstain from resolving a disputable issue of state law while the parties proceeded to resolve the issue in a newly instituted state-court proceeding— in effect, a remand of part of the case to a state court. *See* Garner et al., the Law of Judicial Precedent 618–22.

12

Given the similarity between certification of a question of law to a state supreme court and remand of a state-law issue to a state court under 28 U.S.C. § 1367, I think a passage in a dissent by Justice Sotomayor is instructive:

> [C]ertification is not an argument subject to forfeiture by the parties. It is a tool of the federal courts that serves to avoid friction-generating error where a federal court attempts to construe a statute not yet reviewed by the State's highest court. This Court has certified questions to a state court sua sponte, even though the parties had not sought such relief and even though the district court and the court of appeals previously had resolved the disputed point of state law. *Respondents' delay in asking for certification does nothing to alter this Court's responsibility as a matter of state-federal comity* to give due deference to the state courts in interpreting their own laws.

*Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 29 (2018) (emphasis added; citations and internal quotation marks omitted).[2]

The majority opinion cites seven published opinions by other circuits in support of its waiver ruling: *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 20 (1st Cir. 2018); *Powers v. United States*, 783 F.3d 570, 576–77 (5th Cir. 2015); *Alternate Fuels, Inc. v. Cabanas*, 435 F.3d 855, 857 n.2 (8th Cir. 2006); *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 522 (7th Cir. 2003); *New Jersey Turnpike Auth. v. PPG Indus.*, 197 F.3d 96, 113 (3d Cir. 1999); *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1000–01 (9th Cir. 1997) (en banc); *Doe v.*

---

[2] Of course, certification is a matter of discretion; and the Supreme Court majority declined to certify the state-law issue—the meaning of a state statute challenged on First Amendment grounds. But there was not in that case, as here, a presumption in favor of the state court hearing the matter, the federal courts had been litigating the matter for more than seven years, and the Court majority said that the state defendants, unlike Tufaro, had offered no interpretation of state law that would affect the Supreme Court's conclusions.

*District of Columbia*, 93 F.3d 861, 871 (D.C. Cir. 1996). *Acri* is the only opinion that discusses waiver at any length, and none of the opinions discusses the limits that comity imposes on waiver doctrine. Nonetheless, it is worth giving these opinions a closer look.

The Ninth Circuit's short en banc opinion in *Acri* is quite limited in scope, and is not inconsistent with my position in this case. The only holding in that case is that a district court with supplemental jurisdiction under § 1367(a) is not required to sua sponte (that is, without the issue being raised by a party) address whether to decline jurisdiction under § 1367(c), nor is a court of appeals "required, *sua sponte*, to decide whether the district court abused its discretion under § 1367(c) when neither party has raised the issue." 114 F.3d at 1000. The opinion, however, does not condemn an appellate court for sua sponte taking up the issue of the propriety of declining jurisdiction under § 1367(c). It cites two recent decisions by Ninth Circuit panels that sua sponte raised the issue, and the only respect in which the en banc opinion rejects those panel decisions is that those decisions might be read to suggest that the courts had an *obligation* to sua sponte take up the issue. *See id.* Indeed, the concluding paragraphs of the opinion strongly suggest that federal courts generally should consider sua sponte whether jurisdiction should be, or should have been, declined under § 1367(e). *See id.* at 1001. *Acri* might be more persuasive if it had discussed why comity toward state courts could be so ignored just because the parties did not raise the issue. But I have no particular objection to the holding. Given the congestion in the federal

14

courts these days, one could rarely justify requiring them to look for nonjurisdictional issues not raised by a party. In any event, I see no need to debate an issue not pertinent to this case since Tufaro's opening brief clearly presented the issue when it said, "[T]he District Court should have remanded Dr. Tufaro's *Burk* claim back to state court. No federal claims remained, and the District Court should have declined to exercise jurisdiction over the claim. *Koch v. City of Dell City*, 660 F.3d at 1248." Aplt. Br. at 35 (internal quotation marks omitted).

Of the remaining six opinions cited by the majority opinion, the issue had never been raised by a party in three of them: *Lawless*, 894 F.3d at 20 (circuit court raised issue for the first time at oral argument and requested briefing; none of the briefs objected to retention of the state-law claims); *Alternate Fuels*, 435 F.3d at 857 n.2; and *Voelker*, 353 F.3d at 522. These opinions are therefore fully consistent with *Acri* and this partial dissent.

The other three cases do say that the remand-or-dismissal issue was waived by failure to raise it in district court, but context matters and the decisions in those cases did not address the circumstances before us. In *Powers* the district court had conducted a three-day bench trial, *see* 783 F.3d at 576, which would argue strongly against remand. Moreover, after stating that the issue had been waived, the circuit court proceeded to address it anyway and stated that there was no abuse of discretion by the district court in not remanding the case to state court. *See id.* at 577.

In *New Jersey Turnpike* the plaintiff's argument was not, as here, that dismissal of the state-law claims was proper because all the federal claims had

15

been dismissed before trial, *see* 28 U.S.C. § 1367(c)(3), where there is a presumption in favor of dismissal or remand, but rather that the state-law claims should be dismissed because of their complexity, an issue under 28 U.S.C. § 1367(c)(1), where there is no such presumption. The court devoted just three sentences to the waiver issue. *See* 197 F.3d at 113. It would not be surprising if the circuit court would take action if a party on appeal showed that the circumstances came within the requirements for a presumption of remand or dismissal.

Similarly, in *Doe* the claim was that the district court should not have assumed supplemental jurisdiction because of the difficult issues of District of Columbia law presented. *See* 93 F.3d at 871. The word *comity* does not appear in the opinion. (Perhaps the force of comity considerations was reduced because local District of Columbia law and general federal law derive from the same sovereign.) And, ironically, the circuit court accomplished much of the purpose of dismissal in favor of further state-court proceedings by certifying local-law issues to the District of Columbia court. *See id.* at 872–75. As I mentioned above, certification serves as a mechanism to avoid remand to a state court to resolve state-law issues. The advantage of certification is efficiency. But remand can be a superior mechanism if the state court would likely need more factual development to feel comfortable taking on the state-law issue.

In sum, I question whether the circuits that handed down the opinions cited by the majority opinion would rely on waiver to reject an argument for remand like the one made here. Further, the persuasive force of the cited opinions is

16

substantially diminished because none discussed the proposition addressed above that matters of comity are not in the hands of the parties to the case and cannot be waived by a party.

Accordingly, rather than rely on out-of-circuit opinions in distinguishable contexts, which address waiver in rather summary fashion and totally ignore the proposition that parties cannot waive the comity concerns so fundamental to our federal system of government, I prefer to follow this circuit's long-standing tradition of practice in which we have repeatedly remanded state-law claims when all federal claims were dismissed before trial, even when the issue had not been raised in district court. Five examples of remand or dismissal when the issue was not raised in district court should suffice: *Barnett v. Hall*, 956 F.3d 1228, 1239 (10th Cir. 2020); *VR Acquisitions, LLC v. Wasatch Cnty.*, 853 F.3d 1142, 1150 (10th Cir. 2017); *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010), *abrogated on other grounds by Torres v. Madrid*, 592 U.S. 306 (10th Cir. 2021); *Snyder v. Murray City Corp.*, 124 F.3d 1349, 1354–1355 (10th Cir. 1997); *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995). The panel opinion does not cite, nor am I aware of, any opinion of this circuit holding that remand to state court (or dismissal without prejudice) of state-law claims is dependent on the plaintiff's moving in district court for such remand or dismissal. I would avoid creating such an unfortunate precedent.

17